## BROWN et al. v. PORTNEUF–MARSH VALLEY IRR. CO., Limited, et al.

(District Court, D. Idaho, E. D.   January 18, 1924.)

No. 406.

**1. Waters and water courses ⬳232—Construction company under Carey Act not entitled to favor as public corporation.**

A promotion or construction company organized under the Carey Act (Comp. St. § 4685 et seq.), for the construction of an irrigation project, has for its primary object the making of profits for its organizers, and is not entitled to a privileged status in the courts because in a sense it renders a public service.

**2. Waters and water courses ⬳234—Lien of assessments of operating company under Carey Act held superior to that for unpaid installments for water rights.**

A construction company, which constructed an irrigation system under the Carey Act (Comp. St. § 4685 et seq.), sold water rights to settlers to be paid for in installments. On completion of the system, in compliance with the contract with the state, it was conveyed to an operating company, the stock of which was issued to the settlers on the basis of one share for each acre of land for which water rights were sold, and which under the contracts and its by-laws obtained the money for maintaining and operating the system from assessments levied on such stock. Held, that the lien of such assessments was superior to that of the construction company and its assignee for deferred unpaid installments of the purchase price of water rights, and that the latter could not foreclose and sell such rights, except subject to assessments for the necessary expense of maintaining and operating the system, including unpaid past assessments.

**3. Waters and water courses ⬳234—Words on certificates of stock of irrigation company held not to prohibit assessments for maintenance purposes; "fully paid and nonassessable."**

Where the contracts pursuant to which a corporation was organized to own, maintain, and operate an irrigation system, the stockholders of which were the owners of the water rights, and the by-laws of the company expressly authorized assessments on the stock for the expense of maintenance and operation, the words "fully paid and nonassessable," appearing in the decorative border of the stock certificates, cannot be

---

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

construed to prohibit such maintenance assessments, but must be understood as meaning that the stock is fully paid up and not subject to call assessments for purchase price.

**4. Water and water courses ☞234—Assessments on stock of irrigation company for maintenance held first lien.**

　　Where a company organized to own, maintain, and operate an irrigation system for the benefit of its stockholders, who own the water rights, with power to assess the stock for the expense incurred, has advertised, sold, and bought in stock for delinquent assessments, which it holds subject to the right of the stockholder to redeem, a creditor, seeking to enforce a lien on the water right, which is appurtenant to the stock, cannot deprive the company of the same without paying the amount of its prior lien for expense incurred in maintenance and preservation of the property.

In Equity. Suit by Howard W. Brown and John R. Chapin, trustees, against the Portneuf-Marsh Valley Irrigation Company, Limited, and the Portneuf-Marsh Valley Canal Company, Limited. Priority of liens determined.

Edwin Snow, of Boise, Idaho, for plaintiffs.

McDougall, McDougall & McDougall, of Pocatello, Idaho, for defendants.

DIETRICH, District Judge. The controversy grows out of the Downey Carey Act irrigation project in Bannock county, Idaho. Primarily the question is whether or not assessments levied by a Carey Act operating company for the necessary expense of maintaining and operating the system upon stock issued pursuant to contracts of sale to settlers purchasing water rights are valid as against and superior to the claim of the construction company and its assignees for deferred unpaid installments on account of the purchase price of the water rights, and, secondarily, whether or not, in view of certain irregularities of procedure, the specific assessments exhibited in the record are valid. While the questions are thus generally outlined, unfortunately, as is true touching most controversies growing out of the Carey Act enterprises, it is difficult to discuss them intelligibly without at least a brief general review of Carey Act law and practice.

The project under consideration involved the construction of a reservoir at the headwaters of the Portneuf river, and a system of canals by which both the stored water and the natural flow of the stream were to be diverted and applied to a body of approximately 20,000 acres of land in the vicinity of Downey. In most respects, both of organization and history. it has run the course of other like projects in the state: The "discovery" by a promoter, or a few local citizens, of the requisite natural resources; the acquisition at a nominal cost of a permit to appropriate the water to be used; persuasion of the state land board to make application to the Secretary of the Interior for the withdrawal from entry of public lands embraced within the proposed project; contract by the state with the Secretary of the Interior for reclamation under the Carey Act (Comp. St. § 4685 et seq.); organization by the promoters of the "construction" corporation, with large authorized capital stock, but no real capital; the transfer to it by the promoters of

the water permit and other "rights"; contract by the state, acting through the state land board, with this corporation for the construction of the works, with the exclusive privilege to it of selling water rights to settlers at stipulated prices; the execution of a trust deed by the corporation upon all its property presently owned and afterwards acquired, to secure an issue of bonds, by the sale of which money is procured to carry on the construction work; sale of water rights to future settlers, with a small cash payment and the balance in deferred installments, with lien on the water right and the settler's entry to secure payment; the pledging of these contracts in part to the trustees as further security for the bond issue; temporary operation of the partially constructed system, either by the construction company or by the operating company organized to take over the system when complete; demonstration of the inadequacy of the water supply or of the system; controversy by the settlers, on the one hand, and the promoting company and the bondholders, on the other; litigation and ultimate adjustment, and final turning over of the system to the operating company, the stock of which is held by the purchasers of water rights, and by the construction company. Such, as a matter of public knowledge, is the usual course, and in so far as the facts are disclosed by the record this project does not seem to be an exception to the rule.

[1] In view of the contention, not infrequently urged, that because of its quasi public character the construction or promoting company is to be regarded as occupying a favored position, it is well at the outset to have an understanding of its real status. In a certain sense it renders a public service, and for certain purposes it may be regarded as being, nominally at least, a trustee; but its rights and obligations are defined by contract or by statutory law, and in fact it is neither altruistic in motive nor disinterested in purpose. If in theory it is only an agency of the state, to be reimbursed for its actual expenditures for construction work by receipts from the sale of water rights, in fact it has, within the limits of the law, the characteristics and functions of a promoting company, with the hope, not groundless, of large profits. While this view may seem to be out of harmony with expressions that may be found in some of the earlier decisions of the state courts, it is thought to have support in fact and in the more recent decisions. The enterprise is initiated, not by the state, but by the construction company, or by the initial promoters whom it succeeds, and it, and not the state land board, makes the proposal which ultimately becomes the substance of the construction contract. The acreage charge for water is so fixed that, if the project turns out approximately as planned, a large profit is realized. The project under consideration is typical. The promoting company—the Portneuf-Marsh Valley Irrigation Company, with a capital stock of $500,000, consisting of 5,000 shares, of a par value of $100 per share, was organized by seven persons, subscribing for one share each, or a total of $700, out of the $500,000 capital stock. They entered into a contract with the state for the construction of the system, which in the contract it is expressly estimated would cost $275,000. The system was to supply water for the irrigation of approximately 20,000 acres of land, and the promoting company was authorized to sell

water rights at the rate of $35 per acre for most of the land, and $25 per acre for the balance. If, therefore, we assume an average charge of only $30 per acre, the total possible return to the promoting or con-struction company from the sale of water rights was $600,000, as against an estimated outlay of $275,000.

[2] Coming, now, to a consideration of the specific issues, and the circumstances out of which they arise:

By regular succession the plaintiffs are the successors in trust of the trustees named in the trust deed, covering the system, and executed by the promoting company in October, 1919, to secure the payment of a contemplated bond issue of $300,000. The contract between the promoting company and the state for the construction of the system bears date June 3, 1908, and the contract between the state and the United States, May 14, 1908; and apparently many water rights in the system had been sold to settlers, and contracts therefor were outstanding, at the time the trust deed was executed. While the relation of the rights of the settlers and of the plaintiffs is of incidental importance, a general discussion of the law or of the provisions of the several contracts, including the trust deed, is unnecessary, because, as I understand, the plaintiffs concede that, in so far as concerns the issue to be decided, they stand in the shoes of the construction company and have no greater rights. Indeed, the written brief on behalf of the plaintiffs is introduced by the statement that:

"The only controverted issue presented for decision in this case is the relative priority of the lien of the Portneuf-Marsh Valley Irrigation Company, Limited (the construction company), for the purchase price of its water rights as against the lien of the Portneuf-Marsh Valley Canal Company, Limited, a Carey Act settlers' operating company, by reason of assessments for maintenance."

And in passing it may be added that in article I of the trust deed there is an express provision to the effect that, so long as the construction company is not in default, it "may sell, and may exchange for other property, *free of the lien hereof,* water and water rights to bona fide purchasers thereof and receive and collect the proceeds of such sales and trades precisely as if this mortgage had not been made." And there is no allegation or proof of existing default when any of the water rights presently involved were sold. Hence we shall not need to construe or apply section 5639 of the Idaho Compiled Statutes, providing protection for purchasers of water rights. The further statement of facts and discussion of the issues will therefore be upon the assumption that the status of the plaintiffs is the same as that of the construction company.

As such trustees the plaintiffs also hold in pledge for the payment of bonds numerous settlers' contracts for the purchase of water rights, upon which deferred installments of the purchase price are still due. This is in accordance with the provision of the trust deed requiring that at all times the trustees must have in their possession such contracts or other securities to the amount, in face value, of 150 per cent. of the outstanding bonds. By this suit plaintiffs seek to foreclose the trust deed for default in the payment of bonds, and no question is made by either of the defendants of the right to foreclose for the total amount remaining due upon the bonds.

One of the defendants is the promoting or construction company, namely, the Portneuf-Marsh Valley Irrigation Company, Limited, a corporation, by which the trust deed and bonds were executed. It is insolvent and makes no defense, and, as is usually true in such cases, it is to be inferred that, directly or indirectly, it is under the control of the plaintiffs as trustees, and such moves as it makes are actuated under their direction. The other defendant is the Portneuf-Marsh Valley Canal Company, Limited, a corporation, which in Carey Act practice under the state law is known as the operating company. Such a corporation is provided for in the state contract, to which reference is made in the trust deed, and to the provisions of which the trust deed is subject, and is intended as a convenient entity by which the legal title to the irrigation system is permanently held, and by which it is maintained and operated. Ostensibly it has a capital stock consisting of a number of shares equal to the number of acres to be irrigated, shares being of the nominal value of $1 each, and instead of deeding to each purchaser of a water right the stipulated amount of water he purchases, together with his proportionate interest in the canal system, the whole system, including the water right, is by the construction company deeded to the operating company, and the latter issues to each settler stock at the rate of one share per acre for his water right. In that way the operating company takes over the system, and it is managed and controlled by directors elected as in ordinary corporations. It thus appears that the only property owned by the corporation is the irrigation system, from which it can get no revenue, and for the expense of maintaining and operating of which it is entirely dependent upon assessments upon its issued stock.

In conformity with the general practice in such cases, and pursuant to the express provisions of its contract with the state, the construction company organized the defendant Canal Company, with a capital stock of 20,000 shares. As steps in the organization, it prepared the articles of incorporation and an elaborate set of by-laws, all of which are in evidence. The system was thereupon deeded to the operating company, with certain stipulations agreed to by both the grantor and grantee. The stock of the operating company was issued to the several holders of water contracts in proportion to their holdings, subject to a lien for the unpaid purchase price as provided for by the state contract and the settlers' contracts, and the balance of the stock for which the construction company had not sold water rights was issued to it. By subsequent agreement with the settlers, this latter stock, until sold by the construction company, was not chargeable with the burdens of maintenance and operation.

It would seem that, while originally the irrigation of 20,000 acres was contemplated, for some reason—presumably the ascertained inadequacy of the available water supply of the canal system, or both—the plan was later modified and the acreage cut to 14,000 acres, and of this area the promoting company succeeded in selling rights for only about 12,240 acres. Of the 14,000 shares of stock in the operating company, authorized to be issued, it therefore continued to hold and now holds 1,760 shares, representing a proportionate interest in the irrigation system. As to these shares and the beneficial interest in the system they

represent there is no controversy; the Canal Company conceding that by foreclosure and sale the purchaser will succeed to and acquire the interest of the construction company. So, upon the other hand, the plaintiffs concede that by foreclosure and sale neither they nor the purchaser will get anything in respect to shares of stock held by settlers who have fully paid for their water rights, or in respect to the beneficial interest in the system represented by such stock. Nor as to stock held by settlers for water rights not fully paid for, but in respect to which there is no default, will they get anything other than the right possessed by the construction company, and its assignees, namely, the right to receive such unaccrued installments as are still to be paid.

We are thus brought to a consideration of the immediate facts underlying the primary question stated in the beginning of the discussion. Upon taking over the system, the operating company was under obligation to maintain and operate it, and to meet the expense of such operation it, from time to time, as there was need, levied assessments upon the stock issued to settlers, all pursuant to the provisions of the contract with the state, the settlers' contracts, and the by-laws, which, as we have seen, were prepared and virtually adopted by the promoting company. Upon default in payment by the settlers, which occurred in numerous cases, the delinquency was advertised, and, the stock having been offered for sale pursuant to notice, and there being no other bidders, it was sold to the company itself for the amount of the assessment, plus interest and penalties. Pursuant to a by-law or standing resolution the stock so bought in was and is held by the company, with the privilege to the original holder, or his assignee, to redeem it by paying the amount for which it was sold, together with interest and all subsequent assessments and interest thereon. This stock, aggregating 5,495.2 shares, the company now claims to own, together with the proportionate beneficial interest represented thereby in the system, subject, however, to the privilege of redemption just explained.

In all such cases the settlers also defaulted in the payment of the installments due upon their water contracts with the construction company, which contracts are held in pledge by the plaintiffs as trustees; and in some instances the trustees foreclosed the lien, provided for in the contracts, upon the land and water stock, and became the purchaser of both the land and the water right represented by the stock, and in other cases for a small consideration they acquired the land and water right by deed directly from the settler without suit. Conceding for the time being the validity of the assessments made by the operating company, and the regularity of the proceedings relating to the sales for delinquency, plaintiffs contend that the operating company is practically without right or remedy, and that the interest it thus acquired is subordinate to the right of the promoting company, and hence of their rights as well, to receive the full amount which the settlers originally agreed to pay for the water. This view I am unable to take for several reasons:

In the first place it is manifestly so harsh and inequitable that it ought not to be adopted, unless it is clearly supported by law and the contracts by which the rights of the parties are defined. In the very nature of things a property of this kind cannot be preserved, to say nothing of

operation, without continual care and very substantial expense, and if its right to divert water is to be maintained intact, and indeed if its physical structures are to be preserved, it must be operated at further expense. The necessity of distributing the burden was recognized in the beginning, and accordingly a provision was put into the contracts that maintenance charges should be levied upon the issued stock, whether the stockholder used or did not use the water. When at least some of the contracts were entered into by the settlers, it was contemplated that the burden would be distributed to 20,000 shares of stock, and later, when the controversy was adjusted between the settlers and the construction company, and the acreage was cut down to 14,000 acres, the settlers who entered into the arrangement could fairly assume that the burden of maintenance, and operation would be distributed to 14,000 shares. But, however that may be, water rights for 12,240 acres were actually sold, and this amount of stock thus undoubtedly became subject to assessment.

Under the theory of the plaintiffs, this heavy burden, which was to be borne by at least 12,240 shares, is to be shifted entirely to approximately half that number, the holders of which have persevered in the difficult task of reclaiming their lands, and they are to bear the entire burden of preserving for an indefinite period a property in which the plaintiffs claim to own more than one-half of the beneficial interest. Suppose that these remaining farmers also had lost courage and abandoned the enterprise, what would have become of the plaintiffs' security?

Under a reasonable construction, it is not thought that section 3019 of the Idaho Compiled Statutes, much relied upon by the plaintiffs, supports their position. It is as follows:

"Any person, company or association, furnishing water for any tract of land, shall have a first and prior lien on said water right and land upon which said water is used, for all deferred payments for said water right; said lien to be in all respects prior to any and all other liens created or attempted to be created by the owner and possessor of said land; said lien to remain in full force and effect until the last deferred payment for the water right is fully paid and satisfied according to the terms of the contract under which said water right was acquired."

Were the provisions applicable to the case, in the light of the facts presently to be explained, it would, by express limitation, make such a lien as the plaintiffs claim upon any given piece of land, and the appurtenant water right, superior only to a lien created by the owner of such land. No such lien is here asserted by the operating company. Neither nominally nor actually was the assessment or sale for delinquency made by the owner of the land; both were made by the corporation, acting through its board of directors, an entity entirely distinct from the landowner, although he was a holder of some of its stock. And so far as appears the assessment may have been made, not only without his consent, but against his will—as is often the case with such assessments, particularly if the landowner is not making use of the water. Without success, a Carey Act trustee made a similar contention against the lien of a tax in the case of Continental & Com. Savings Bank v. Werner, 36 Idaho, 602, 215 Pac. 458. The reasoning of the court there is sound and is equally applicable to this case.

If fallaciously it be argued that the assessment lien upon A.'s stock is voluntarily created by him, because the assessment was levied by at least a quorum of the board of directors, for some of whom he may have voted, with equal relevancy it could be said that the lien of a tax upon his land is voluntarily created by him because as a qualified elector he may have voted for some or all of the county commissioners by some or all of whom the tax was levied. It is sought to give plausibility to the contention by assuming, not only that the farmers, acting as a unit, unanimously elected the board of directors, but that they were the only qualified voters. Were such assumptions material, it could be pointed out that they are without foundation in fact. Admittedly the water rights under consideration were never fully paid, nor is there any showing that even 35 per cent. of the price was ever paid, and it is a fair inference that the holders were in default when the assessments in question were made. But by the terms of the original contract with the state, and of the settler's contract, where a water right is not fully paid for, the purchaser is required to indorse and deliver the stock to the construction company, with power in it to vote such stock as it may deem proper so long as 65 per cent. of the purchase price remains unpaid. And in the new agreements executed by the settlers after the general settlement in March, 1915, of certain controversies between the settlers and the construction company, it is expressly provided that the settler's stock is to be delivered to the company, and that the voting power remain in the settler only so long as he is not in default. In case of default the company is empowered to vote the stock as it may see fit. It therefore appears that the promoting company and not the settler had the power, under the stock in controversy, to vote for directors.

But if we were to give to this statute the construction urged by the plaintiffs, how does it apply to the facts? It is uncontroverted that the settler's contract is one, not *for* sale, but *of* sale, of a water right, and of the requisite shares of stock in the operating company. The settler "hereby purchases certificate No. X for Y shares of the capital stock of the Portneuf-Marsh Valley Canal Company, Limited." Such is the language of the instrument. And, indeed, whether the full purchase price has been paid or not, the settler is recognized in all the pertinent writings as having title to and being the owner of the stock and water. The right of the promoting company is that of a lienor for the unpaid balance of the purchase price. But, as we have seen, by the express terms of the trust deed the sale of a water right operated, ipso facto, to release it and the proportionate interest in the system from the lien of the trust deed, and the trustees were in turn protected by a deposit with them, in pledge, of the settler's contract of purchase. The trustees are here seeking to foreclose only the lien of the trust deed; they are not, as pledgees, attempting to foreclose the liens of water contracts; to such proceedings the several settlers would, of course, be indispensable parties; and in any view of the statute in question it can have application only to such liens and to such proceedings. It therefore follows that in so far at least as concerns the stock embraced in the 5,495.2 shares that pertains to water contracts which are still outstanding, and have not been taken over by the plaintiffs, the statute has no application. And, it may be added, it is difficult to see how upon any theory

such contracts or stock are at all within the issues of this suit. The remainder of the 5,495.2 shares plaintiffs already hold; all rights of the original purchasers therein, and in the water contracts and in the proportionate parts of the irrigation system represented thereby, having been acquired by them at sales upon the foreclosure of such contracts, or by voluntary conveyances directly from the settlers.

By reference to article XV of the trust deed, it will be seen that by its express terms the trustees were authorized to pay assessments and other charges against the stock, and in case of the default of a settler to foreclose the water contract, and in the absence of other bids in an amount sufficient to cover their entire claim under the contract they are authorized to become purchasers, "and thereupon said lands and water shall become subject to the lien" of the deed "to the same extent as if said property had been specifically named" therein. I find no provision expressly authorizing the taking of voluntary conveyances directly from the settler; but if, as contended by the plaintiffs, that authority is implied, and a conveyance so taken has the status of a sheriff's deed on foreclosure, then in all cases where they have acquired the settler's rights, and have become the owners of both land and water, they hold such land and water in trust for the promoting company, subject to the lien of the trust deed. But, however that may be, plainly the liens of the water contracts originally issued to the settlers have been fully extinguished, and the statutory provision under consideration could no longer have any application. And, it may be added, together with the lien of the contract has gone the obligation of the settler to pay, for under the provision of the trust deed, above referred to, the trustees were authorized only to bid the full amount due upon the contracts, including interest and costs, and presumably when voluntary conveyances were taken the settlers' contracts were thus satisfied and terminated. So that, if we were to take the view of the statute contended for by the plaintiffs, there would be no lien superior to the right of the operating company under its assessment sales, for there is nothing at all due from the settlers to the promoting company or the plaintiffs, and neither it nor they have any lien at all by virtue of the water contracts, either superior or inferior.

In the next place, it is thought that, were the statute applicable to the issues, and were it susceptible to the construction placed upon it by the plaintiffs, they could not succeed, for the reason that such meaning is inconsistent with the contracts and by-laws binding upon the promoting company. By these instruments it must be deemed in advance to have waived such superior right as the statute would have conferred, and they are now estopped to claim such right. It is to be borne in mind that, not only did the promoting company enter into the contract with the state before any sales were made to settlers, but it prepared in advance of such sales the form of settler's contract, and also organized the operating company, preparing its articles of incorporation and its by-laws, and that the operating company was under its control until the water rights, or, at least, a large number of them, were sold, and the stock of the operating company issued. Any ambiguities, therefore, in the instruments are to be resolved against it.

By the contract with the state the duty is imposed upon the construc-

tion company to organize the operating company for the purposes, among others, of taking over, operating, and maintaining the system, and "levying and collecting tolls, charges, and assessments" for such purposes. Such levies were to be made upon all "issued" stock, and *"issued"* stock is stock after its issuance to settlers purchasing water rights. The sale of the water right and the issuance of the stock operated to dedicate the water right and make it appurtenant to the subdivision of land for which it was sold. And plainly no transfer of the stock thereafter by the purchaser, whether to the promoting company or to the trustees, or to some other person, could change this status. It continued to be issued stock, subject to its ratable part of the burden of maintaining and operating the system.

In the settler's contract, the description of that which was sold, not only covers the water, but specifically the number of shares of stock in the operating company, together with the form and number of the certificate. In this contract the power of the construction company to control the operating company and to vote its stock is recognized, for in paragraph 2 it is stated that, "so long as it retains control of the" operating company—*that is, so long as it shall continue to vote a majority* of the stock of that company "as provided in the state contract" —it will cause it to maintain the system in good order. Then follows the express general provision that the operating company is to have power to levy all necessary tolls, charges, and assessments, whether water is or is not used by the stockholder. The settler agrees that upon default in the payment of any installment on the purchase price, or of the interest thereon, "or any annual charge, toll, or assessment for the operation and maintenance of the irrigation system," the construction company might declare the entire purchase price due and payable, and could enforce its lien, not only upon the water right, but upon the land to which the water right is dedicated.

The settler is further made to agree that no water is to be delivered to him, not only while any installment of the purchase price is in default, but "while any toll or assessment is due and unpaid" to the operating company. And finally it is agreed that the contract may be assigned by the company, whereupon the payment of principal and interest shall be due and payable to the assignee"; but the payments for tolls, assessments, and charges for the delivery of water shall "be paid to the operating company, and payment thereof may be enforced by it."

Similarly, and perhaps even more elaborately, the by-laws disclose the understanding that it would be the right and the duty of the operating company to levy, and collect against the stock, assessments to meet the necessary expenses of maintenance and operation. In section 6 of article I, covering the subject of the stockholders' right to vote, it is provided that no stockholder shall have any right to vote until all assessments levied against his stock have been paid. Section 1 of article V, covering the subject of the relation of the water to the land, provides that each certificate of stock issued shall contain a description of the lands to be irrigated, and that the shares and water rights evidenced thereby shall forever be dedicated and inseparably appurtenant to the land, unless the same shall become forfeited through a failure of the owner or holder thereof to pay assessments against such

stock, or for the use of water thereunder from the canal, or shall be forfeited or sold by operation of law. Section 5 of article V, in so far as it is relevant, is as follows:

"For the purpose of defraying the expenses of the company of whatsoever kind and paying the cost of maintaining, managing, and operating said canal system, the board of directors of the company are authorized and directed to levy such tax or taxes, charge or charges, assessment or assessments, as in the judgment of said board may appear necessary or proper to raise the money or revenue required. All such expenses, taxes, costs, and charges to be apportioned among all the stock issued by the company, which has been applied and made appurtenant to land, but no such assessment or tax shall be levied against shares which have been issued to or are held for the benefit or in the interest of the Portneuf-Marsh Valley Irrigation Company, Limited, and which has not been sold or made appurtenant to land.

"The taxes or assessments herein provided for shall be levied against the owners of the shares of stock applied or made appurtenant to land, regardless of whether water has been used for irrigation purposes by the holder of said stock."

Section 7 of article V expressly provides that the surplus stock—that is, stock representing water rights which the promoting company has never sold—shall for all purposes be regarded as unissued stock, and that such stock "shall have no voting power and shall not be subject to any tax, assessment or charge." The provision, and the only provision, upon which the plaintiffs place any reliance, is section 8 of article V, which is as follows:

"All shares in this corporation shall be held subject to the rights of the Portneuf-Marsh Valley Irrigation Company, Limited, until the amount due such company, its successors or assigns, shall have been fully and finally paid, as provided in the contract between said corporation and the purchaser of shares and as provided in the contract between the said Portneuf-Marsh Valley Irrigation Company, Limited, and the state of Idaho."

But plainly this provision creates no new right in the construction company, or obligation on the part of the operating company. "All shares * * * shall be held"—by whom? The *unissued shares* by the operating company, and they were to be held for the construction company, to be issued to purchasers of water as provided in the state contract. Touching them there are no controversies. And the *issued shares*, they were not *held* by the operating company at all; they were outstanding, and were *held* by the several purchasers of water rights, and they were to be *held* by *them*, subject to the rights of the construction company as such rights were defined by the water contracts and the state contract; that is, the right of lien as so defined, the right of the construction company to assign as in pledge, as provided in the contracts, and the right to vote under certain conditions as provided in those contracts, and possibly other rights. It would be strange indeed that if, when it was preparing these by-laws, the construction company had in mind such an important matter as the subordination of the right to collect assessments, which it knew were indispensable to the very preservation of its security, it would have been content to express such intent in the vague, general terms of this section, while at the same time, in the next preceding section, it so clearly and fully expressed the understanding that the unissued stock was not subject to assessments. And, when we consider at large the relation of the parties one to the other, the general purposes to be subserved, and even the intelligent self-

interest of the promoting company, it is inconceivable that, at the time when these transactions were being carried on and the contracts and by-laws formulated, any one could have regarded the lien of the construction company as anything more than a first mortgage upon the stock and land to which the water right is appurtenant. All it could have thought of getting or retaining was a lien of that dignity. Such an understanding is clearly disclosed in the settler's contract itself, where it is provided that upon acquiring the legal title to the land embraced in his entry the settler would execute, in proper form, a mortgage which should be a first lien upon the land so mortgaged. But the lien of a mortgagee or of a pledgee on stock in an irrigation company or other corporation is not superior to taxes upon such property, or of assessments upon it levied for the purpose of meeting necessary expenses of maintenance and operation. To protect himself such lienholder must see that the tax or assessment is paid. When we consider that in the first place it was necessary for the construction company to maintain this system, and when it turned it over to its creature, the operating company, it was necessary for that company to maintain it, and for the very preservation of the security it was necessary to levy assessments upon the stock, it is incredible that any one could have understood these provisions, or any of them, as expressing or implying an understanding that such claims for preservation and operation were to be subordinated to the construction company's lien, or that the operating company would have accepted the trust upon such a condition. And, as already suggested, if the language of the instruments, taken as a whole, is of doubtful meaning, under familiar principles the doubt must be resolved against the construction company, and hence against the plaintiffs.

Plaintiffs also refer to provisions of later instruments, namely, an agreement by which a general controversy was settled, the deed of the system to the operating company, and a new settler's contract, all formulated in 1915; but the language in them is substantially identical with that of the by-laws. They also seek to strengthen their case by the assumption that the state contract exempts unsold and unissued stock from assessment; but the assumption seems to be an inadvertence, for I find no such provision in that contract.

### Alleged Invalidity of Assessments.

[3] A full discussion of the several contentions urged by the plaintiffs under this heading would extend the opinion to an unreasonable length, and they may be briefly disposed of:

The first point is that the assessments are invalid because of the words "fully paid and nonassessable," forming a part of the decorative border of the stock certificates. But does not such a view necessarily imply bad faith and duplicity upon the part of the construction company? The basic contract—the one between it and the state—expressly authorizes assessments on the stock. Its contracts with the settlers, in which there is set forth the form of the stock certificate, expressly authorizes assessments. The by-laws, prepared and in effect adopted by it, expressly and elaborately provide for assessments. Are we to conclude that this marginal phrase was inserted as a "joker"? The more reasonable view,

and' one entirely consistent with the theory of the good faith of all parties concerned, is that the phrase was intended to refer to assessments in the nature of calls. 6 Cyc. 265; 10 Cyc. 484. The stock is fully paid, and hence is nonassessable—that is, it is not subject to "call" assessments for the purchase price; such is the meaning. This explanation finds corroboration in the resolutions adopted in 1908 at the first meeting of the board of directors, who, it may be added, were at the same time the directors of the construction company. There was a technical problem to meet: The settler was to get his water right for $35 per acre, the manner of paying for all of which is provided for in the water contract. And he was also to receive stock, the par value of which was $1 per share. How was this $1 to be paid? He was not to pay it in addition to the $35 per acre; hence, when he received his certificate of stock, it bore upon its face the assurance, in the words under consideration, that the stock was paid up and he would not be subject to "call" assessments.

Plaintiffs themselves appreciate the necessity of qualifying the general import of the word "nonassessable," and accordingly suggest that it should be construed as denying the power to levy "statutory assessments," but not "charges in the nature of tolls." But not only is there no intimation in the phraseology, either of the stock certificates or any of the other writings, of such an intention, but the theory is wholly inconsistent with the provisions of the by-laws, where (section 6, article V) "statutory assessments" are expressly authorized. There is nothing in the suggestion, touching this point, that the plaintiffs have a right superior to that of the construction company. They and their predecessors have always had full knowledge of the written instruments and of their provisions. On the general subject, see Hall v. Eagle Rock & Willow Creek Water Co., 5 Idaho, 551, 51 Pac. 110.

As to the temporary suspension of the charter of the operating company, it will be noted that in fact it was not subject to the license tax, which it failed to pay. But if, under the peculiar statutory provision, we regard the suspension as valid, because of the inadvertent failure to make a report as required, it is still true that under the statute, upon such suspension, the board of directors become trustees to preserve and care for the property of the corporation, and as such it was not only the right of the directors here acting as such trustees, but their duty to incur such expenses as were necessary for the proper performance of these obligations. The assessments in question simply represent such necessary expenses, and are to be regarded as an equitable charge upon the property, superior to other liens. The charges are such as receivers might and should incur as expenses of the receivership, with the right on their part to be reimbursed ahead of all other claimants, whether secured or unsecured.

As to this point, therefore, as well as other points which I shall not particularly discuss, it is thought that plaintiffs must fail for one or both of two considerations:

(1) Section 4749 of the Idaho Compiled Statutes provides that:

"No action must be sustained to recover stock sold for delinquent assessments, upon the ground of irregularity in the assessment, irregularity or defect in the notice of sale or in its publication, or defect or irregularity in the

sale, unless the party seeking to maintain such action first pays or tenders to the corporation, or the party holding the stock sold, the sum for which the same was sold, together with all subsequent assessments which may have been paid or may be due thereon, and interest on such sums from the time they were paid; and no such action must be sustained unless the same is commenced within six months after such sale was made."

[4] (2) Plaintiffs are here seeking equitable relief; they must do equity. The defendant operating company does not claim absolute or indefeasible title to the stock sold for delinquency: It is willing to recognize the original holders, or their successors in interest, as the present owners if they will pay what is equitably due upon the stock, ratably with other stockholders. For the amounts so claimed the defendant has an equitable lien, of which it cannot be justly deprived. It has preserved the property in which the plaintiffs and the construction company have a large beneficial interest, and they ought not by a court of equity to be aided in escaping their fair proportion of the expense incident to such preservation. In many cases, as we have seen, plaintiffs and the construction company have for some time not only had title to the issued stock, and the water rights it represents, but also the lands to which the water rights are appurtenant, with such improvements as were placed thereon by the settlers, and now to relieve them from the burden necessarily incurred in preserving their property would be against good conscience. Hall v. Eagle Rock & Willow Creek Water Co., supra.

Accordingly the holding will be against the plaintiffs upon these issues. The briefs go no further. The cause was tried rapidly, and, considerable time having elapsed since the trial, I shall have to ask counsel for further assistance touching subordinate matters, concerning which there is apparently little or no controversy, but which will have to be reduced to form and defined before a decree can be entered. For this purpose it is possible that a transcript of the evidence will have to be gotten out, unless counsel, by reason of their familiarity with the facts, can, with the exhibits before them, work out results upon which they can agree.

We must find: (1) The amount of principal unpaid on the bonds. (2) The date to which the interest has been paid thereon, and the present amount of accrued interest. (3) Disbursements, if any, made by the trustees, under the terms of the deed, for which they are entitled to reimbursements. (4) Credits, if any, applicable to a reduction of the indebtedness. (5) Trustee's compensation. (6) Attorney fees. (I do not recall whether these last two matters were stipulated or not.) (7) There must also be a clear description in the decree of the property to be sold, with special reference to the question of what (a) the purchaser will get, and (b) what the operating company will have left. (My impression is that a clear definition of the interrelated rights and interests of the operating company and the purchaser will involve some difficulty and should have the most careful consideration, and possibly will have to be the subject of a further conference between court and counsel.) (8) Other matters possibly which do not presently occur to me.

I would suggest that as a preliminary step counsel for the plaintiffs give attention to the preparation of a proposed decree, covering the points above noted, and attach to it a memorandum explaining his mode of reaching the several amounts, where computations or money items are involved.