ORCHARD HOMES DITCH CO., Respondent, *v.* SNAVELY, ET AL., Appellant.

No. 8639

Submitted May 15, 1945.   Decided June 7, 1945.

159 Pac. (2d) 521

Mr. J. C. Robinson, of Missoula, for appellant.

Mr. Leon L. Bulen, of Missoula, for respondent.

MR. CHIEF JUSTICE JOHNSON, delivered the opinion of the court.

Defendant Saulter has paid the separate judgment awarded against her, but appeals from that part of the decree adjudging the separate judgments awarded against the other defendants, her predecessors in interest, to constitute liens upon her property, Lot 25 of "Cobban & Dinsmore Orchard Homes" in Missoula county, Montana, and decreeing their foreclosure. The record includes no bill of exceptions.

The facts as found by the court and admitted by the pleadings are as follows: Prior to 1902 Lot 25 was part of an arid tract owned by one Davis which was then platted as "Cobban & Dinsmore Orchard Homes," apparently under the promotion of the Cobban Company. On February 7, 1902, Davis deeded this lot to one Beagles, appellant's predecessor in in-

terest. On the same day the Cobban Company, by warranty deed, conveyed to Beagles five miner's inches of water previously appropriated from Missoula river, with a proportionate interest in the diversion and distribution system, subject to the duty of contributing proportionately to the maintenance and operation of the system. This deed, according to the court's finding, "conveyed these ditches and water rights as an appurtenance to such Lot 25," and subsequent conveyances of the lot always included the water and ditch rights. Apparently most of the water and ditch rights in the system subsequently became vested in the plaintiff Orchard Homes Ditch Company, a non-profit corporation organized in 1906 to operate the system and prorate the expense to the various tracts served. The water right to Lot 25 was never transferred to the plaintiff, but the latter has always been recognized as the agency by which the system was operated for the benefit of all concerned.

The record does not set forth the exact terms of the conveyance of the water and ditch rights, but the findings of fact state that it "conveyed to said Beagles * * * the right to use such Five Inches of water, but charged the grantee with the duty of contributing to the maintenance of such ditch in proportion to her ownership therein * * *. Such conveyance from the Cobban Company to Beagles conveyed these ditch and water rights as an appurtenance to such Lot 25. * * *

"While the grant of this land itself from Davis to Beagles did not contain the covenant or provisions relative to the water or water rights, whether the appurtenance created by the other deed, from the Cobban Company to Beagles, constituted an appurtenance or covenant running with the land does not seem material, in view of the fact that such conveyance of the water and water rights created a lien against such property for the share or proportion which this land might be charged for maintenance each year, and thus creating a lien on the land by contract for the performance of obligations not then in existence, which obligation of course was the payment by

the owner of the share charged to the land for the maintenance of the water rights; and this contractual charge will continue against the grantees of Beagles and further and later grantees, and on down against anyone who continued to use the service furnished by the plaintiff, and the land itself would be impressed with a lien for such charges as against anyone who obtained the service. * * *

"That the right to receive the benefits of irrigation, and the reciprocal duty and obligations of each owner of the land contributing its proportional part or prorata share of the maintenance of such water system and rights, is a proper charge against the party receiving the water and the service during each year, and if not paid is a lien, either by covenant running with the land or contractual obligations impressed on the land which receives such benefits; * * *."

Defendant Snavely was the owner of Lot 25 during the irrigation season of 1935, the defendants Noland during the seasons of 1936 and 1937, and defendant and appellant Saulter during the seasons of 1938 and 1939. The charges for each irrigation season are customarily computed and statements delivered to the various owners on or before November of each year. Appellant paid the charges for 1938, but the charges for the other years mentioned remained unpaid and were found due and owing against the defendants as follows: Snavely, 1935, $12.50; the Nolands, 1936, $12.50; 1937, $20; Saulter, 1939, $10. Costs prorated against the various defendants brought the separate judgments against them to $18.66, $45.33 and $13.14, respectively. Appellant paid the judgment against her but the other defendants did not. She therefore appeals from the judgment in so far as it orders foreclosure of a lien against her property for the collection of the amounts awarded against the other defendants.

In addition to the facts stated above, the trial court found that Lot 25 was worth only about $100 in its original state, but that by reason of the irrigation and the benefits arising therefrom it had reached a value of about $1,500; that the

abstract of title contains all recorded instruments and convey-
ances and discloses the whole manner of operation and owner-
ship of the water system; that upon her purchase of the lot
the appellant received the abstract, read it, had it examined,
and knew its contents; that appellant "knew by record and by
knowledge in that very neighborhood" the facts as to the
operation of the system and could easily have learned whether
accrued charges had been paid by her predecessors; that the
latter had the same knowledge and were chargeable therewith.

As shown above, the court's findings of fact, parts of which
include conclusions of law, were that the right to receive the
benefit of irrigation was appurtenant to the land and that the
reciprocal burden of the proportionate cost of operation "if
not paid is a lien, * * * and the plaintiff is entitled to enforce
such lien * * * by a foreclosure of the lien against the land
* * *." Decree was rendered accordingly. The sole question is
whether, under the circumstances, the land is subject to liens
for 1935, 1936 and 1937 water charges unpaid by former
owners.

Thompson on Real Property, Permanent Edition, states [vol-
ume 7, page 111, section 362] : "A covenant that is incident to
the property conveyed and affects its value runs with the land
and binds a subsequent purchaser. Thus, where the owner of
a dam and waterpower granted a certain amount of the water
to one who covenanted to pay his ratable share of the expense
of keeping in repair the dam and race-way in proportion to
the number of square inches of water conveyed to him, it was
held that such covenant ran with the estate granted, and was
binding upon subsequent owners."

But under statute like ours there can be no covenant running
with the land when it is not contained in the grant of
the real property to be charged. Secs. 7416, 7417; Fresno
Canal & Irrigation Co. v. Rowell, 80 Cal. 114, 22 Pac. 53, 13
Am. St. Rep. 112; Fresno Canal & Irrigation Co. v. Dunbar,
80 Cal. 530, 22 Pac. 275; and Fresno Canal & Irrigation Co. v.
Park, 129 Cal. 437, 62 Pac. 87. This, however, does not mean

that there may not be a lien against the land, as the above California decisions disclose. The rule followed in those cases is summarized by Thompson as follows: "By express stipulation of the parties, a covenant which of itself would not run with the land may be made binding as a lien. Thus, although the Code of California provides that a covenant can not be made to run with the land except where such covenant is made in connection with and as a part of the conveyance or transfer of the land itself, an express agreement that such a covenant shall run with and bind the land is effectual. The contract in question related to the furnishing of water to irrigate land by means of a ditch, and it was provided that the right to the water to be furnished should be and become appurtenant to the land, and this was followed by an express agreement that the contract to pay the money therefor should bind the land. This created a lien upon the land for the enforcement of the covenant, and, when recorded, was notice to subsequent purchasers. The subsequent purchaser held the land subject to the lien, but was not personally liable to pay the debt." Vol. 7, pp. 116, 117, Sec. 3628.

The law is summarized further in the Restatement of the Law of Property, Division 5, Servitudes, in Chapter 45, entitled "Running of Burdens," as follows:

"The most perplexing of the many questions which may arise out of a promise respecting the use of land of the promisor concerns the extent to which others than the promisor are bound by his promise. * * * (p. 3191).

"Out of the promise, assuming it to be legally effective, will arise an obligation which is promissory or contractual in nature. Such an obligation, so far as it affects the original promisor, is not unique since, as to him, it is not essentially different in its nature from the obligation arising out of any sort of a valid promise. But in its effect on others a promise respecting the use of land is unique in that such a promise may, under certain circumstances, 'run' with land. Ordinarily a promise creates a promissory or contractual obligation only on the

part of the one making the promise. But, under the rules relating to the 'running' of promises respecting the use of land, a successor to the ownership of one who has made a promise respecting the use of his land may, merely by virtue of such succession, become subject to promissory or contractual obligations on promises made by his predecessor. (p. 3192).

''Independent of the rules under which the successor to the ownership of one who has made a promise respecting the use of his land may become subject to a promissory obligation on the promise made by his predecessor there may arise out of the promise equitable obligations affecting the title to the land to which those who succeed to the land will, in the absence of an effective defense, become subject. This fact does not, however, require that they be regarded as promisors. To the extent to which the promise is enforceable in equity it creates in the beneficiary thereof an equitable interest in the land of the promisor to which the successors of the promisor are subject as they are subject to other equitable interests. (p. 3192).

''One of the sanctions for the enforcement of a promise respecting the use of land of the promisors may consist in a lien upon the land respecting the use of which the promise was made. The lien may arise out of the promise itself or may result from the creation by the promisor of a security additional to and independent of the promise.

''If the lien arises out of the promise itself, its existence does not of necessity depend upon the intention of the promisor. The promisor may intend merely the performance of his promise. The lien may arise out of the fact that the law finds it the most appropriate device for the enforcement of that promise. * * * (p. 3193).

''Under the circumstances of a particular case the most effective way of enforcing a promise respecting the use of land may be by the enforcement of a lien upon the land respecting the use of which the promise was made. Where this is true and where the remedy by lien is appropriate a lien will be created and enforced even though it is not provided for in the

terms of the transaction out of which it arose. A situation in which a lien is often found to be an appropriate means of enforcing a promise respecting the use of land is that where a promise is made to pay for a benefit received in the use of a particular tract of land. An example of such a situation is that in which the owner of land agrees to pay at a stipulated rate for water furnished in irrigating specified land. The enforcement of the performance through a lien may be the only effective and the most appropriate way of enforcing the performance of the promise. If so it will be so enforced.

"The successors to one who has made a promise respecting the use of his land under such circumstances as to create a lien on the land respecting the use of which the promise was made are subject to the lien except in so far as they are entitled to the protection of the doctrine of bona fide purchaser or of the recording acts." p. 3239.

The rule is further elaborated in Tiffany on Real Property, 3d Ed., as follows:

"Even in jurisdictions where, as in England, the burden of a covenant does not run with the land, an agreement as to the use of land may, under certain circumstances, affect a subsequent purchaser of the land who takes with notice of the agreement, equity in such case enjoining a use of the land in violation of such agreement. As stated in the leading case on the subject, 'the question is not whether the covenant runs with the land, but whether a party shall be permitted to use the land in a manner inconsistent with the contract entered into by his vendor, and with notice of which he purchased.' In equity, the question whether such a covenant runs with the land is material on the question of notice only, since, if it runs with the land, the purchaser is bound regardless of his knowledge of it, while if it does not so run, he is bound only if he took the land with notice of the covenant." Vol. 3, Sec. 858.

"The great bulk of authority in the United States either ignores or denies any distinction between affirmative agreements and negative or restrictive agreements, and we find

that in numerous decisions an affirmative agreement in connection with the land has been regarded as within the doctrine, with the effect that a purchaser from the promisor with notice of such an agreement, though he may not be personally liable for its nonperformance, takes the land subject to the possibility that a court of equity will enforce its performance, or reparation for its nonperformance, by a decree in reference to the land. The adoption of this view, that even an affirmative agreement may be enforced as against a purchaser with notice, involves merely a necessity of regarding such an agreement, if for the payment of money by the promisor to the promisee, as creating an equitable lien or charge on the lands, and if for the doing of another character of act, as justifying a decree for the specific performance of the agreement." Vol. 3, Sec. 859.

"An equitable lien is the right to have property subjected in a court of equity to the payment of a claim. It is not a jus in re nor a jus ad rem; neither a debt nor a right of property, but a remedy for a debt. These rights involve a personal obligation upon the owner of land, which equity will enforce against the land, ordinarily by a decree for the sale thereof, and which will follow the land into whosesoever hands it may pass, until it reaches those of a purchaser for value without notice." Vol. 5, Sec. 1559.

For further discussion of equitable liens see 4 Pomeroy's Equitable Jurisprudence, 5th Ed., Chapter VII.

The agreement in litigation in the three California cases cited above is shown in Fresno Canal & Irrigation Company v. Dunbar, supra [80 Cal. 530, 22 Pac. 276], to be as follows: " 'It is understood and agreed that the water to be furnished under this agreement is intended to form a part of the appurtenances to said section of land, and the right thereto shall be transferable only with, and run with, said land, * * *. The party of the second part, for himself, his heirs and assigns, covenants and agrees that he and his successors in interest and estate in said land will pay annually to the party of the

first part, * * * the sum of four hundred dollars, * * *. It is covenanted that this agreement and the covenants therein contained on the part of the party of the second part run with and bind the land.' "

The court said: "We are inclined to the opinion that counsel are right, that this was not such a covenant as would run with the land. (Citing statutes and decisions.) But there is something more in the contract than the attempt to extend the liability to subsequent purchasers or assignees of the party contracting. There is an express agreement that it shall bind the land itself; therefore, it does not depend upon the question whether a covenant on the part of the then owner of the property would run with the land or not. The question is whether the provision in the contract was such as to create a lien upon the land. We think it perfectly clear from the language used that this was the intention of the parties. It was provided that the right to the water to be furnished by the respondent should be and become appurtenant to the land, and this was followed by an express agreement that the contract to pay the money therefor should bind the land. This, we think, created a lien upon the land, and as the complaint alleges that the contract was acknowledged and recorded, it was notice to the appellant of the existence of such lien. Under such a covenant the land is liable in the hands of a subsequent purchaser. * * * He purchased and held the real estate subject to the lien, but did not become personally liable to pay the debt."

In other words, the court there held that a lien upon the land was expressly created by the agreement that the land should be bound. In the present case we are not informed as to the exact provisions of the separate conveyance of the water right. But, as noted above, the findings of fact include the statements that the conveyance from the Cobban Company to Beagles conveyed the ditch and water rights as an appurtenance to Lot 25, but required the payment of a proportionate part of the expense of maintenance of the system; that: "Such conveyance of the water and water rights created a lien

against such property, * * * thus creating a lien on the land by contract * * *.''

Whether or not the conveyance expressly provided that the lot should be bound, it is clear that it expressly provided that the water right was to be appurtenant to Lot 25 and that its enjoyment was subject to payment of the proportionate cost of maintenance of the irrigation system. Obviously the system cannot be maintained without expense, and the failure of any payment must either prevent its maintenance or inequitably increase the burden upon other interests. Each owner is chargeable with knowledge of these facts, since they appear in his chain of title; no owner can equitably expect his land to have the benefit without the concomitant burden, which is an inseparable incident of the water right, and without which its benefit cannot exist. Since the benefit of the water right, which cannot exist without the burden, has attached to the land it seems equitable to conclude that in the absence of any provision or showing to the contrary the burden must also have attached to and passed with it. ''The incident follows the principal * * *.'' Sec. 8769, Revised Codes. The lien was therefore created by the conveyance, although not in express terms, as held in the three California cases cited above.

As the above text authorities disclose, equity regards such conveyance or contract as creating an equitable lien on the land, even when only a burden is involved; the equities are much more compelling where, as here, the burden imposed is merely the necessary concomitant of the benefit conferred by the same instrument.

The record does not disclose reversible error.

The judgment appealed from is affirmed.

Associate Justices Morris, Cheadle, and Angstman, concur.

Mr. Justice Adair, (dissenting).

The plaintiff ditch company supplied irrigation water to the successive owners of lot 25 of Cobban and Dinsmore's Orchard Homes in Missoula county. In 1935 the lot was owned by the defendant Snavely and in 1936 and 1937 it was owned

by the defendants Noland. The charges for the water so supplied by the ditch company for such years were not paid. In 1938 the lot was conveyed to the defendant Martha Saulter, the present owner, and thereafter the ditch company brought this action to foreclose a lien which it claims against the lot for the amount of the unpaid water charges including those for the years 1935, 1936 and 1937. Mrs. Saulter recognizes her liability for the payment of the water charges for the water supplied since she became the owner of the land but she denies that the ditch company has any lien against her land for the unpaid charges for water supplied to the defendants Snavely and Noland in 1935, 1936 and 1937, being prior to the time that she purchased the property.

A lien can only be created by contract of the parties or by operation of law (Section 8225, Revised Codes) and it is never an incident of a contract or money obligation unless made so by the contract or by some rule of law. Goldthwaite v. Janney, 102 Ala. 431, 15 So. 560, 28 L. R. A. 161, 48 Am. St. Rep. 56. In this case there is no statute or rule of law creating any lien on the land in favor of the ditch company. "In the absence of a lien given by law, neither party can create one without the consent or agreement of the other." 33 Am. Jur. sec. 6, pp. 421, 422. In the record here I find no contract of the parties that creates any lien on lot 25 for the unpaid water charges which the ditch company failed to collect from the owners of the lot who preceded Mrs. Saulter. Without a lien there is nothing to foreclose. "It is not one of the functions of the courts to create a lien." 33 Am. Jur. sec. 6, p. 422. The imposition of affirmative duties upon an owner of land should result only from a clear expression of the intent of the parties and should not be implied in the absence of such an expression. Coulter v. Sausalito Bay Water Co., 122 Cal. App. 480, 10 Pac. (2d) 780. To create a lien on the land the language of the contract must be definite and specific and must be a direct declaration that such a lien is created by its terms. While the ditch company has the power to enter into a contract with

those to whom it supplies water to the effect that the contract amount to be paid the company by the consumers for the water supplied them shall be a first lien upon the lands on which the water is delivered and used yet, in the absence of such definite and specific contract, there is no lien and the consumer's right is simply a right of service,—a right to be furnished water upon the payment of the charge or price therefor. There being no contract entered into by the parties creating a lien on lot 25 the ditch company must look for payment to the individual consumers to whom the water was furnished.

The parties having failed to create a lien on the land by their contract the courts may not properly supply this deficiency and create a lien for them. No lien having been created there is no lien to foreclose and, in my opinion, it was error for the trial court to decree the foreclosure and sale of Mrs. Saulter's lot to satisfy the indebtedness contracted by previous owners of the lot for water supplied them during their occupancy of the premises and long before Mrs. Saulter had acquired any interest therein.