VALIER CO., RESPONDENT, v. STATE ET AL., APPELLANTS.

No. 8912.

Submitted September 30, 1949. Decided January 13, 1950.

215 Pac. (2d) 966.

330

Mr. Justice Angstman dissenting.

Mr. H. B. Landoe, Bozeman, Mr. Herbert W. Conrad, Jr., Conrad, for appellants. Mr. Landoe argued orally.

Mr. Forrest H. Anderson, Helena, for respondent. Mr. Anderson argued orally.

Mr. Charles E. Pew, Helena, amicus curiae.

Mr. D. W. Doyle and Mr. Howard T. Francisco, Conrad, Mr. Elnor O. Overland, Big Timber, Mr. Leif Erickson, Helena, Mr. G. C. Cisel, Billings, Mr. Harry L. Burns and Mr. Bernard W. Thomas, Chinook, Mr. Horace S. Davis, Billings, Mr. Vard

Smith, Livingston, and Messrs. Coleman, Jameson and Lamey, Billings, granted leave to file briefs amici curiae on petition for rehearing only.

THE HONORABLE W. W. LESSLEY, District Judge sitting in place of MR. JUSTICE BOTTOMLY, disqualified:

This is an appeal from a declaratory judgment entered in the district court of Pondera county, declaring and determining certain of the rights, status and other legal relations of the Valier Company, a corporation, plaintiff.

The facts stem from the vicissitudes of the operation of a typical Carey Land Act Project, commonly known as the Valier Project. The facts are many and involved and can be understood only as measured and weighed against the background of their source, the Carey Act, the amendments thereto, the Montana statutes in compliance therewith, and the various contracts of the parties.

A Carey Act Project is initiated under special legislation, an Act of Congress known as the Carey Act, dated August 18, 1894, Chapter 301, sec. 4, 28 Statutes at Large, 372 and 422, as amended June 11, 1896, Chapter 420, 29 Statutes at Large, 413 and 434, 43 U. S. C. A., secs. 641 to 644, and finds its operative source in Montana under special legislation, Chapter 180, political Code Montana, sections 1966 to 1995, R. C. M. 1935.

The law provides for a donation and grant of desert lands by the Federal Government to the particular state concerned; this donative gift is conditioned upon the state causing the lands so segregated to be reclaimed, occupied and cultivated by actual settlers.

More completely an illustrative situation (which is an accurate designation of the Valier Project now under consideration) may be described as follows: The Federal Government grants arid lands to the state, upon condition that the state will provide for the reclamation of the lands so granted. The state, to accomplish this condition, enters a contract with a construction company, wherein the construction company agrees to construct an

irrigation system on the lands in question and to procure actual settlement of those lands by actual settlers. When the construction of the irrigation system has reached a point where there is an adequate supply of water available for the land, the state requests and the Federal Government patents to it the lands so concerned. The construction company sells shares of water stock in an operating company to the settlers; the state sells the Carey Act lands so reclaimed only to those persons who shall have bought shares of water stock from the construction company. The settler, thus armed with this contract of purchase of water stock goes to the Carey Land Board which represents the state and applies for a patent to the Carey Act lands. The water stock is issued to the settler, a patent is granted to him by the state and under the provisions of the Acts and the contracts, the water stock then becomes appurtenant to the lands.

It is provided under the Carey Land Act and state legislation concurrent with the Act, that after the construction company has completed the building of the irrigation system and it has been accepted as satisfactory by the state with whom the contract was made, and after the construction company has sold a certain percentage (in this case 90%) of the water stock to the settlers and has been paid in full for such 90% of the water stock, it must then turn the ownership of the system over to an operating company, the medium through which the settlers are to control the irrigation system.

The operating company is composed of the owners of Carey Act land to which the water stock so sold is appurtenant; thus, the holder and owner of the share of water stock has two distinct rights as a result of his ownership; he has the right to a specified amount of water per acre and he also has a proportionate ownership of the entire irrigation system.

The amendment of June 11, 1896, 43 U. S. C. A., sec. 642, added to the original Carey Act a provision: '' * * * a lien or liens is hereby authorized to be created by the State to which such lands are granted and by no other authority whatever, and when created shall be valid on and against the separate legal

subdivisions of land reclaimed, for the actual cost and necessary expenses of reclamation and reasonable interest thereon from the date of reclamation until disposed of to actual settlers * * *." This was a mere enabling Act to broaden the original Carey Act to empower the state to provide by appropriate legislation for special liens to protect the construction company for expenses incurred by it in the construction of the reclamation project. Montana has so provided in section 1983, R. C. M. 1935.

In the typical Carey Land Act Project, we have these parties concerned:

1. The United States Government acting through its various agencies and under the federal statutes.

2. The state of Montana acting through its Carey Land Act Board and under its various statutes enacted to allow the state of Montana to take advantage of the provisions of the Carey Land Act.

3. The construction company acting under the applicable statutes, its contracts entered into with the state of Montana as provided for under the Carey Land Act and the Montana Carey Land Act, and such contracts as may specifically set out rights, liabilities and duties of a construction company.

4. The operating company, as provided for under the Carey Land Act and Carey Land Act of Montana and contracts between the Carey Land Act Board of Montana and the construction company, which is in its essence a corporation that results from the fruition of the project; it is the final owner of the system; and it is the legal entity representing the individual interests of the settler of the Carey Land Act lands.

5. And finally the actual settler himself, the individual for whom all of this was planned.

It must be clear also that the various relations are interlocked by contractual relations spelled out clearly by specific contracts and special statutes both of the federal and state governments concerned.

The complexities of the situation involved in the instant case will be clear only if the general exposition heretofore given is

used as a mirror in which to reflect the actual operations of the Valier Project. This project with which we are here concerned reached its present status under covenants and conditions contained in several contracts of predecessor construction companies of this plaintiff and respondent, the Valier Company, with the state of Montana. These contracts contain over one hundred and twenty pages and appear in the transcript as exhibits 1 to 8. There must be no doubt that all of the eight contracts concerned be considered together. These contracts followed the general outline heretofore mentioned, and specifically provided for the prices of the water stock and set out the terms of payments under which the sales were to be made by the construction company to the actual settlers.

There were certain conditions in these contracts which are clearly conditions precedent and important for an understanding of the problem.

1. The construction company was to complete the irrigation system to the satisfaction of the state of Montana with whom it had originally contracted, and this satisfaction was to be expressed by the state of Montana acting through its Carey Land Act Board by stating that the construction was complete and satisfactory to the state of Montana.

2. The construction company was to sell 90% of the total number of shares so issued to the settlers and to receive from them payment in full for the 90% of the total number of shares to be so sold. After the completion of these two steps the legal title of the irrigation system so built by the construction company was to be conveyed by it to the operating company; the operating company would then be the sole legal owner of the irrigation works and the operation and control of the project by the operating company would then be in the hands of the settlers, that is, those who owned the water stock which had been so sold and paid for in full by them and who ranched the lands so segregated and reclaimed.

It must be evident that the intent and purpose of the Carey

Land Act and the Montana statute creating a lien, as provided under the enabling Act of the Carey Land Act, was to assure the construction company of its construction costs and a reasonable interest thereon. The exclusive right to sell the water stock was granted to the construction company. It provided that each settler on the lands must buy one share of water stock for each irrigable acre of land, and this, of course, as stated before, was to be done by him before he could secure a patent to any of his land from the state of Montana.

Chronologically, the project was to work as follows: The state of Montana was to secure segregated Carey Act lands from the United States government free of cost after having performed certain acts and met certain conditions, as provided for under the Carey Land Act. The construction company was to build an irrigation system to service the land so segregated. It was to issue and sell shares of stock in an operating company to the settler. The settler was to secure title to his land from the state of Montana after issuance of the shares of stock. In the event that the water rights or shares of water stock were not paid for at the time of the execution of the contract to purchase between the construction company and the settler, the certificate of said stock was to be endorsed and delivered to the construction company as collateral security for the payment of any sum or sums due or which might become due from such settler to the construction company; and until 35% of the purchase price of said water stock had been paid for the construction company might vote such stock at all meetings of the stockholders of said operating corporation. It was understood that the money so obtained by the construction company from the sale of water stock was to be kept by it as payment of the costs incurred in the construction of the irrigation system and the money so paid by the settler to the state of Montana for the lands so patented to him by the state of Montana was to be kept by the state to pay for organizational costs under the project.

The Valier Company, plaintiff and respondent herein, is the

construction company. One of the defendants herein is the state of Montana acting through its Carey Land Act Board. The other defendant is the Pondera County Canal and Reservoir Company, the operating company, organized under the provisions of the contracts and statutes of this project. And finally, and probably most important, are the actual settlers now actually settled upon and engaged in ranching operations upon these lands, who though they are not named as actual parties, are vitally concerned in this matter.

In order that there may be no misunderstanding, it should be made quite clear that the final acceptance of this irrigation system commonly known as the Valier Project, has not been approved and finally accepted by the Carey Land Board. Further, that the ownership of the lands and water stock appurtenant thereto situated in the project have not been finally transferred by the construction company to the operating company. It appears, however, that by means of foreclosure and deeds in lieu of foreclosure, exercised under the special lien statute, the construction company has now come into possession of many thousands of acres of this land within the project, together with the appurtenant water rights. The issues to be determined on this appeal are four in number.

1. Did the construction company acquire title to the land and water appurtenant thereto, through its foreclosure proceedings or by deeds in lieu of foreclosure?

2. Is the construction company obligated to sell lands and water so acquired to any particular class of persons?

3. Are the construction company sales of such land and appurtenant water so acquired, limited to resale in lots of 160 acres or less to any one person?

4. May the water stock so acquired by the construction company by foreclosure or deeds in lieu of foreclosure be construed as "a sale" to be counted toward the 90% completion provision of the contract between it and the state of Montana?

The Carey Act itself does not create a lien, nor does it define

any lien so created, nor limit the rights to a lien. Portneuf-Marsh Valley Canal Company v. Brown, 274 U. S. 630, 47 S. Ct. 692, 694, 71 L. Ed. 1243. The amendment of June 11, 1896, of the Carey Act empowering the states concerned to provide for liens by appropriate legislation was and is an enabling Act. What lien statutes were or are enacted or what meaning and effect is to be given their operation is strictly a question for the several states concerned.

This amendment was a creature of necessity. States which were expected to take advantage of the Carey Act either did not have the means or were faced with the constitutional prohibitions against lending credit for the construction of large canal and irrigation works that would be necessary to reclaim the wide areas of land contemplated under the Act. Further, means by which persons or corporations having ample capital and interested in acting for the states in building these works should be made secure by lien or liens on the lands and water rights for the large sums of money necessary to be advanced by them.

This desire created the June 11, 1896, amendment, reading in part: "Section 1. * * * That under any law heretofore or hereafter enacted by any State, providing for the reclamation of arid lands, *in pursuance and acceptance of the terms of the grant* * * * a lien or liens is hereby authorized to be created by the State to which such lands are granted and by no other authority whatever, and when created shall be valid on and against the separate legal subdivisions of land reclaimed, *for the actual cost and necessary expenses of reclamation and reasonable interest thereon* from the date *of reclamation until disposed of to actual settlers* * * *." (Emphasis supplied.) See Chapter 67, sec. 1316, p. 2390, 3 Kinney on Irrigation and Water Rights.

That such enabling Acts permitting the creation of a lien or liens by the state was fraught with some risk, to what was generally understood to be the purposes of the Carey Act, was conceded by the most ardent friends of that Act. 28 Congressional Record, p. 622 et seq. The amendment as enacted carries signi-

ficant language as will be noticed by reference to the amendment as set out in part above. It provides that a lien may be allowed for the actual cost and necessary expenses of reclamation and the reasonable interest thereon, and the time of the lien is from the date of reclamation until disposed of to actual settlers. Thus, this enabling Act allowed the several states so concerned to provide for a lien or liens by state statute; a lien to secure money expended by those who were engaged in financing the project for the construction of the necessary irrigation works and canals. It enabled the creation of a lien, and that only, until the lands to which those liens had attached were disposed of to actual settlers. This was the final language of the Act despite any discussion in Congress or controversy raised by textbook writers.

We are here faced with a consideration of the Montana statute, which created the lien, permitted and authorized in the federal enabling statute of the Carey Act referred to above. As stated by the Supreme Court of the United States, "The construction of state statutes so enacted, and the status of liens created under them are local questions * * *." Portneuf-Marsh Valley Canal Company v. Brown, supra.

Section 1966, R. C. M. 1935, is part of the concurrent legislation of the state of Montana under the Carey Land Act specifically creating such a lien in the state of Montana.

It is significant that this section is an integrated part of Chapter 180, Political Code of Montana, which is entitled "Reclamation of Arid Lands," and finds itself in statutory company with sections setting out the powers of the Carey Land Act Board of Montana as to contracts, rules and regulations, rights of contractors, dispositions of proceeds of sale or lease of such lands, and other allied subjects pertaining to Carey Act lands segregated within the state of Montana.

The special legislation creating section 1966, R. C. M. 1935, carries this significant and preliminary statement: "The Carey Land Act Board shall have and it is hereby granted full power and authority *to take all steps necessary to comply with all and*

*singular the conditions* of an act of Congress approved August 18, 1894, entitled, 'An act making appropriations for sundry civil expenses of the government for the fiscal year ending June 30, 1895, and for other expenses,' and all acts amendatory thereto now in force or which may hereafter be enacted providing for the reclamation of desert lands by state within whose borders the same may lie, and acts pertaining thereto, to the end that the state may receive the full benefit and advantage accruing to it from the same.'' Sec. 1966, R. C. M. 1935. (Emphasis supplied.)

Even a superficial reading of this statute creating a lien impresses one with *its special character*. It provides that water rights under the Carey Act shall attach to and shall become appurtenant. to the land as soon as title passes from the United States to the state of Montana. It creates a lien for the deferred payments of water rights on behalf of the person or corporation furnishing water for any tract of land; Makes it a first and prior lien, provides in case of default that it may be foreclosed in the same manner as mortgages of real property. The specific steps to be followed, notices to be given, time for redemption, persons who may redeem, are set out in particularity in the statute. This language is important: ''When the lien holder becomes the purchaser at such foreclosure sale, and such lands and water rights are not redeemed by the original owner within twelve months, then at any time within three months thereafter *any person desiring to settle and use such lands and water rights* may apply to the purchaser at such foreclosure sale to redeem such land and water rights * * *.'' Sec. 1983, R. C. M. 1935. (Emphasis supplied.)

Further, the special character of this legislation is to be found not only in its provisions but in its placement as part and parcel of the Montana Carey Land Act cited as Chapter 180, Vol. 1, Political Code, R. C. M. 1935, entitled, ''Reclamation of Arid Lands.''

Our court speaks on this matter for the first time. The re-

spondent construction company, in its briefs and argument on appeal, insists that guideposts for this court's decision are to be found in the case of North Side Canal Company Ltd., v. Idaho Farms Co., 60 Idaho 748, 96 Pac. (2d) 232, 236, and North Side Canal Company Ltd. v. Idaho Farms Co., 9 Cir., 107 F. (2d) 481. The precise question before the court there was: Does foreclosure or deed in lieu of foreclosure by the construction company extinguish the Carey Act Construction Company's lien for construction charges so that the property thus acquired and held by it becomes subject to a maintenance lien as any other land and water right of the project? The action was brought by the operating company to foreclose a statutory lien granted by the Idaho statutes (Montana has no such statute) to enforce maintenance assessments that the operating company incurred to supply water to the lands in the project. To dispose of the precise question before it, the Idaho Supreme Court held that the operating company was entitled to its lien on said land for the maintenance assessment. There can be no doubt that this case does not "run upon all four feet," nor is it "close, true and perfect" with the instant case we are now considering. The very Idaho case relied on, almost entirely, by the plaintiff respondent herein contains this judicial warning: "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." This case from Idaho does not even begin to meet or decide the questions now before us; it is silent as to the central question of what shall be considered as application toward the 90% level; it is silent as to the duty, if any, of the construction company to resell the lands in limited acreage. It stands for the proposition that the lands held by the construction company are subject to liens for assessments of water. This is admitted here.

We are to interpret our own statutes enacted as the machinery established by Montana to accept the benefits of the Carey Land Act. We are impressed that in the instant case the project has not been accepted as completed, nor has the own-

ership of the system been transferred to the operating company representing the actual settlers. Our interpretative findings must be made against and in accordance with the accepted background of the statutory lien as defined in section 1983, R. C. M. 1935, a complete, exclusive and special statutory procedure for the foreclosure of those liens so created by the statute. We cannot lightly brush aside the obligation and duties which rest most heavily upon the Carey Land Act Board of the state of Montana; obligation and duty to comply with the general philosophy and background of the Carey Land Act and to comply with the conditions and restrictions inherent in the Federal and Montana Acts, and in the contracts between the state of Montana and the construction company. The board's obvious and solemn duty to protect the interests of the actual settlers in the project itself is evident. See Sutherland on Statutory Construction, Vol. 3, sec. 5402; also Fergus Motor Co. v. Sorenson, 73 Mont. 122, 235 Pac. 422.

It has been well stated that all parties to contracts relating to ▆ irrigation projects under the Carey Land Act are bound by all the provisions of the respective contracts and by all the provisions of the Acts of Congress and by all the provisions of the statutes of the state on the subject. Brown v. Portneuf-Marsh Valley Irr. Co., 9 Cir., 1925, 5 F. (2d) 895, modifying, D. C. 1924, 299 F. 338 and certiorari denied, Portneuf-Marsh Valley Canal Company v. Brown, 1926, 270 U. S. 637, 46 S. Ct. 204, 70 L. Ed. 773.

''The laws which subsist at the time and place of the making ▆ of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms.'' United States ex rel. Von Hoffman v. Quincy, 4 Wall. 535, 18 L. Ed. 403, at page 408. The above quotation is quoted with approval in City of Philipsburg v. Porter, 121 Mont. 188, 190 Pac. (2d) 676, at page 678, wherein is also cited a number of Montana cases to the same effect. See also, Hales v. Snowden, 19 Cal. App. (2d) 366, 65 Pac. (2d)

342, certiorari denied in Colyear v. Hales, 302 U. S. 715, 58 S. Ct. 34, 82 L. Ed. 552.

At the time when the contract was entered into on July 23, 1909, between the Carey Land Act Board and the Conrad Land and Water Company, the predecessor construction company to plaintiff the federal law known as "The Carey Act," 43 U. S. C. A., sec. 641, and the amendment of June 11, 1896, sec. 642, providing for liens for actual costs and expenses of reclamation, were in full force and effect, as well as sections 1966 to 1995, Revised Codes of Montana of 1935, accepting said grant. The third paragraph of section 641 of 43 U. S. C. A. declares: "Any State contracting under this section is hereby authorized to make all necessary contracts to cause the said lands to be reclaimed, and to induce their settlement and cultivation in accordance with and subject to the provisions of this section; but the State shall not be authorized to lease any of said lands or to use or dispose of the same in any way whatever, except to secure their reclamation, cultivation and settlement."

The fourth paragraph of section 641, supra, contains the following proviso: "*Provided,* That said States shall not sell or dispose of more than one hundred and sixty acres of said lands to any one person, and any surplus of money derived by any State from the sale of said lands in excess of the cost of their reclamation, shall be held as a trust fund for and be applied to the reclamation of other desert lands in such State."

Section 642, provides: "Under any law heretofore or hereafter enacted by any State, providing for the reclamation of arid lands, in pursuance and acceptance of the terms of the grant made in the preceding section, a lien or liens is hereby authorized to be created by the State to which such lands are granted and by no other authority whatever, and when created shall be valid on and against the separate legal subdivisions of land reclaimed, for the actual cost and necessary expenses of reclamation and reasonable interest thereon from the date of reclamation *until disposed of to actual settlers;* and when an ample supply of water is actually furnished in a substantial ditch or canal,

or by artesian wells or reservoirs, to reclaim a particular tract or tracts of such lands, then patents shall issue for the same to such State without regard to settlement or cultivation * * *.'' (Emphasis supplied.)

Section 1980, R. C. M. 1935, provides: ''Any citizen of the United States, or any person having declared his intention to become a citizen of the United States, over the age of twenty-one years, may make application, under oath to the board, to enter any of said land at any time after the same has been classified, in any amount *not to exceed one hundred and sixty acres for any one person;* and such application shall set forth that the person desiring to make such entry does so *for the purpose of settlement in accordance with the act of Congress and the laws of this state* relating thereto, and that the applicant has never received the benefit of the provisions of this act to an amount greater than one hundred and sixty acres, including the number of acres specified in the application under consideration.'' (Emphasis supplied.)

Section 1983, R. C. M. 1935, provides for ''a first and prior lien on said water right and land upon which said water is used for all deferred payments for said water rights,'' and that ''upon default in any of the deferred payments secured by any lien under the provisions of this act, the person, company of persons, association, or incorporated company holding or owning said lien may foreclose the same in the *same manner as mortgages of real property are foreclosed.* * * * The sheriff of said county shall in all such cases give all notices of sale, and shall sell all such land and water rights, and shall make and execute a certificate of sale to the purchaser thereof, and at such sale no person, company of persons, association, or *incorporated company owning and holding any lien shall bid in or purchase any land or water right at a greater price than the amount due on deferred payment* for said water right and land, and the cost incurred in making the sale of said land and water right.'' (Emphasis supplied.)

The foregoing Code section also provides: That the owner at any time within twelve months after the foreclosure sale may redeem the land and water right, and the purchaser shall assign the certificate of sale to such land and water right to such original owner upon payment to him within such twelve months of the amount of the lien for which the same were sold at such foreclosure sale, together with the interest at ten percent per annum, costs, and charges thereon; that when the *lien holder* becomes the purchaser at such foreclosure sale, and such land and water right are not redeemed by the original owner within twelve months, then at any time within three months thereafter any person *desiring to settle* and use such lands and water rights may apply to the purchaser at such foreclosure sale to redeem such land and water rights, and such purchaser shall assign the certificate of sale to him, upon payment by him of the amount of the lien for which the same was sold, together with interest, costs and charges thereon; that in case the property shall be redeemed by any person other than the original owner, the sheriff shall, upon presentation of such certificate issue a deed for such land and water right to the person redeeming the same; and that if the land and water rights are not redeemed by any person within the time and manner mentioned above, the sheriff shall, upon presentation of the certificate of sale by the original purchaser, issue a deed to such purchaser.

Under the rule for construction of contracts, hereinbefore stated, the provisions of said sections 641 and 642 of 43 U. S. C. A. and of sections 1976, 1980 and 1983, R. C. M. 1935, enter into and form a part of the contracts between the Carey Land Act Board and the predecessor companies of the plaintiff and are binding on the plaintiff.

The contract of July 23, 1909, executed by the state through its Carey Land Act Board, as first party, and Conrad Land and Water Company, plaintiff's predecessors, as second party, is in harmony with the provision of said laws. Such contract provides that the second party will construct the proposed irrigation sys-

tem and will procure settlement upon said "Carey Act Lands," in areas *not to exceed 160 acres,* also will provide for the sale of shares of water rights in said system to persons filing upon or purchasing said lands; that the second party shall have the exclusive right to sell water rights from said irrigation system; that the first party agrees to sell said "Carey Act" lands to such person as may be by law entitled to file upon the same for the sum of fifty cents per acre, to be paid at time of application to said board for the entry of such land; that when proof is furnished to said board that the applicant is settled upon the land and has cultivated one-eighth thereof, and complied with the law and regulations said board will patent said land to said settler; that said second party will sell to persons filing upon said lands, a water right or share in said irrigation system to be evidenced by a share of stock for every acre of land filed upon or purchased from the state, at a price of $40.00 per share, payable $3.00 in cash and the remainder in fourteen equal installments, each bearing interest payable annually at the rate of 6% per annum, the purchaser having the right to make payments before the due dates, or the entire amount at time of purchase.

The second contract, dated September 24, 1912, executed by the state through the Carey Land Act Board, as first party, and Valier-Montana Land and Water Company, as second party (being plaintiff's predecessor), is substantially the same as the contract of July 23, 1909, but includes additional lands and fixes the price at which the second party may sell the lands in list 12 at fifty cents per acre, and the lands in list 14 at one dollar and fifty cents per acre, to such persons as are or may be by law entitled to file upon the same.

The second party also agreed to sell to persons filing on the land a water right or shares in the irrigation system, to be evidenced by a share of stock for every acre of land filed upon or purchased from the state at a price of $50.00 per acre, payable $5.00 in cash and the remainder in fourteen equal installments, each bearing interest payable annually at the rate of 6% per annum.

By supplemental contracts dated June 29, 1918 and January 8, 1921, by the same parties that executed the contract of September 24, 1912, the price of said shares of water. stock was again raised to $60.00 a share, and later raised to $80.00 a share.

The patents issued by the state of Montana to persons filing on and acquiring lands in said irrigation system contain the following covenants: ''This conveyance is executed pursuant to authority conferred by the laws of the State of Montana and by the laws of the United States known as the 'Carey Act' approved August 18, 1894, and amendments thereto, relating to the reclamation of arid lands. And it is expressly provided and covenanted that the water right acquired under the provisions of said laws to all of the lands herein conveyed shall attach, and be appurtenant, to said lands, and shall be forever afterward transferable only therewith.''

From the provisions of the Federal and State laws hereinabove quoted or referred to and said contracts executed pusuant thereto, it is manifest that it was the policy and intention of the Congress and of the Montana legislature that such Carey Act lands could be finally acquired only by actual settlers thereon in separate tracts of not to exceed 160 acres to each qualified settler.

The amendment of the Federal Act on June 11, 1896, 43 U. S. C. A., sec. 642, quoted above, contains nothing to show a new or different policy or intention.

3 Kinney on Irrigation and Water Rights (2d. Ed.) in section 1323 discusses the purpose of this amendment. There it is said: ''One object of the amendment was that it had been ascertained that the states named in the Act, and which were expected to take advantage of the same, either had not the means or were prohibited by their constitutions from lending their credit to the construction of the large canals and irrigation works necessary to reclaim large tracts of land; and that it was necessary to make some provision by which persons or corporations having ample means and acting for the States in the construction of these works should be made secure by a lien or liens on the lands and

water rights for the large sums of money necessarily advanced by them.''

Kinney also mentions that in the discussion of said amendment in Congress, it was ''pointed out that this amendment, in the form in which it finally passed, would necessarily result in the acquisition by wealthy individuals and corporations of large bodies of land, to the exclusion of the settler. This result was *practically* conceded by the friends of the measure.'' (Emphasis supplied.)

Plaintiff is here seeking to have this amendment so construed.

The language of said amendment, quoted above herein, does not show that it was the intention of the amendment to authorize the acquisition of large areas of land by individuals or companies or to change the provisions of the original Act, quoted above, prohibiting the state from selling or disposing ''of more than one hundred and sixty acres of said lands to any one person.''

In fact Kinney on Irrigation, in further discussing said amendment, in section 1333, says: ''Since the amendatory Act of June 11, 1896, the presence of actual settlers prior to the issuance of the patent by the United States to the State is not necessary. * * * Therefore, after the State has complied with the conditions precedent, and re-claimed the land, by furnishing an ample supply of water in a substantial ditch or canal or by artesian wells, or reservoirs, there is still another condition which must be complied with, before an absolute title to the land can vest, and that is that the land must be disposed of *only to actual settlers, as specified in the amendatory Act.*'' (Emphasis supplied.) Citing 36 Land Dec. 509; also citing 36 Land Dec. 342, containing instructions to the secretary of the interior of March 30, 1908, requiring each state to furnish the commissioner of the general land office a tabulated statement showing the names of the persons to whom such states have passed title to such Carey Act lands and the amounts and descriptions of land patented by the state to *each of such persons* and to furnish a like statement for each year thereafter.

It is manifest from the provisions of the Montana Law, enacted in 1905, accepting the provisions of the Carey Law and amendment thereof of June 11, 1896, and especially those found in sections 1976, 1980 and 1983, R. C. M. 1935, that the Montana legislature did not construe said amendment to the Federal Act as giving a lien holder, by forecloscure thereof or by deed in lieu of foreclosure, a right to acquire an unlimited title with unrestricted rights and powers to handle the lands embraced within a Carey Land Act project.

Section 642 of the Federal Act authorizes the state to create a lien on such lands, which will be valid thereon "until disposed of to actual settlers."

It is also manifest from the provisions of the contracts drawn up and signed by the Montana Carey Land Act Board and the construction companies, predecessors to plaintiff, that it was not the intention to give the purchasers at foreclosure sales, or the grantee in a deed in lieu of foreclosure, an unlimited title with unrestricted rights and power to handle said land, as is clearly shown by the provisions of said contracts and patents from the state.

The provisions of the patents, quoted above, issued to settlers whose lands were thereafter foreclosed by plaintiff or its predecessors, or deeded to them in lieu of foreclosure, contain covenants running with the land and therefore binding on the purchasers at the foreclosure of said liens thereon, or the grantees in deeds issued in lieu of foreclosure. As to such covenants see sections 7416, 7417, 7418, and 7421, R. C. M. 1935; Orchard Homes Ditch Co. v. Snavely, 117 Mont. 484, 159 Pac. (2d) 521; Berryman v. Hotel Savoy Co., 160 Cal. 559, 117 Pac. 677, 37 L. R. A., N. S., 5; Pelser v. Gingold, 214 Minn. 281, 8 N. W. (2d) 36; 7 Thompson on Real Property, sec. 3622.

Section 1976, R. C. M. 1935, provides: "Any person or company entering into a contract to construct canals or other irrigation works, and to sell water rights to settlers under this act, may maintain and operate the same until perpetual water rights appurtenant to ninety per cent of the lands, to reclaim which such

works were constructed, *have been sold and paid for*, when such works shall be turned over to the settlers and others owning rights to take water from such canals, who shall have the right thereafter to maintain and operate it. * * *'' (Emphasis supplied.)

Pursuant to such provisions of section 1976, R. C. M. 1935, the contract between the Carey Land Act Board and the predecessor of plaintiff provides: ''Upon a final acceptance of said irrigation system by the state, and ninety per cent (90%) of the water rights, or shares, hereby authorized to be sold, having been sold to, and paid for by, the purchasers or owners of land under said system, the party of the second part shall, and, at any time prior thereto, with the consent of the Carey Land Act Board, it may, transfer and convey, by good and sufficient deeds of conveyance, to said Teton County Canal and Reservoir Company, all its right, title and interest * * *.'' (Said Teton County Canal and Reservoir Company being the predecessor of the defendant Pondera County Canal and Reservoir Company.)

Section 1983, R. C. M. 1935, provides that ''no person * * * or incorporated company owning and holding any lien shall bid in or purchase any land or water right at a greater price than the amount due on deferred payment for said water right and land, and the cost incurred in making the sale of said land and water right.''

It is admitted by the appellants herein that the construction company by means of foreclosures or deeds in lieu of foreclosure did acquire title to the land in question and the water appurtenant thereto. However, it does not follow from such admission and this Court cannot hold that as a result thereof the construction company thereby severed the umbilical cord which bound these lands to the Carey Act restrictions and conditions, both of the Federal Government and the state of Montana, and of the covenants of the contracts of the parties. Rather, it logically follows from such admissions that the limitations as to acreage,—as to sale to actual settlers and as to price and conditions of resale,—are all of the character of covenants running

with the project land. These covenants are spelled out in certain language. The contract between the state of Montana and the construction company sets out in the premises of the contract this definite language: "Where as the party of the second part [construction company] did, heretofore, to-wit on the 19th day of September, 1908, file with said Carey Land Act Board a proposal for the construction of certain irrigation works situated in the County of Teton, State of Montana, under the provisions of Section 4 of the Act of Congress, approved August 18, 1894, commonly known as 'The Carey Act,' and the Acts amendatory thereto, and the laws enacted by the State of Montana in pursuance of the powers granted by said Acts of Congress, designed for the reclamation of certain public lands therein described, and other lands * * *." The contract then goes further and sets out the specific purpose in this language: "That said party of the second part [construction company] will construct the irrigation system mentioned in said proposal, and hereinafter referred to and more particularly described, and will procure settlement upon all said 'Carey Act Lands' for which patents are actually issued from the United States to the State of Montana, in areas not to exceed one hundred and sixty (160) acres to each settler and will provide for the sale of shares of water rights in said irrigation system, from time to time, in the manner hereinafter provided, to persons filing upon or purchasing said 'Carey Act Lands,' and to the purchasers or owners of other lands situated under said irrigation works, or any extension thereof, which are susceptible of irrigation therefrom such shares of water rights to said 'Carey Act Lands' to be sold on the terms hereinafter provided; and said party of the second part will also provide for transferring the management, control and final ownership of said irrigation works to the purchasers of shares or water rights in said system." These two excerpts from contracts existing between the state of Montana and the construction company, the respondent herein, definitely impose covenants which run with that land and are attached to it *and are eliminated only when disposed of to actual settlers.* These

contracts provide the favorable climate necessary for such a project.

The plaintiff in this action is no less bound by these covenants than are the defendants. It is clear that the construction company was to be fully protected, but that protection was to extend only to the extent of reimbursing it for the moneys expended in the construction of the works together with reasonable profit on the investment. It was not to arm it with legal weapons whereby it might by mere legal nicety become a stranger within the project itself. This construction company did not have to undertake the project and was as capable as the entrymen of determining whether the land and water would be of sufficient value to afford adequate security and return to the construction company.

The policies and purposes of the Carey Land Act and the interests and obligations of the actual individual settlers on the land are not to be disregarded by any strained interpretation of section 1983, R. C. M. 1935.

We are now faced with the question as to whether or not the water stock so acquired by the construction company by foreclosure or deeds in lieu of foreclosure is a sale so as to meet the requirements of the 90% completion provision. It is admitted that under the contracts controlling the parties, water stock was purchased from the construction company by the settler by means of an installment contract of sale. The lien statute does make the water appurtenant to the land, but surely this does not alter the actual elements of the water stock transaction itself. What are they? The shares of water rights are sold to entrymen filing upon and purchasing Carey Act lands. This is made under an installment contract (and only those cases permit foreclosure or deeds in lieu thereof) wherein the purchaser may pay Three Dollars in cash per acre with the balance payable in 14 equal annual installments bearing interest at the rate of 6% per annum and payable annually. The construction company in the cases where the water stock is not paid for in full, may require endorsement and delivery of the stock from the purchaser to the

construction company. This is a collateral security for payment of any sums due, and further, the construction company has the right to vote the stock so reconveyed to it until 35% of the purchase price of the stock has been paid by the settler. Thus, the subject of the sale, where it is for credit (and that is the only type we are concerned with in the instant case) is never parted with by the construction company, and in addition, it has the added right where default occurs to terminate the conditional sales by foreclosure or deed in lieu of foreclosure.

From an actual analysis it must be clear that this is comparable to a contract for sale with the title reserved in the seller until the purchase price is paid. The purchaser, until he had made full payment to the seller, which is the construction company, did not have title to the water right stock; he had the right to purchase and he had the further right to demand delivery *if* and *when* he paid for it in full; in fact, until 35% of the purchase price was paid, he was without even the right to vote the stock he had agreed to purchase.

What is the legal effect of the termination of the contract of purchase by the construction company through either foreclosure or acceptance of a deed in lieu of foreclosure? Can we say that it is a sale? And particularly can we say it is a sale within the meaning and understanding of the Carey Land Act contracts? Aside from the particularities of the statutory and contractual meaning of the irrigation project, it is clear that it is not a sale within the definition stated in section 7581, R. C. M. 1935. State ex rel. Malin-Yates Co. v. Justice of Peace Court, 51 Mont. 133, 149 Pac. 709. But even if we say it does mean a sale in the generally accepted term and definition of a sale, we are still met with the general purpose and intent of the parties of this particular arrangement known as a Carey Land Act Project.

This terminal requirement of the contracts, which reads as follows: "Upon a final acceptance of said irrigation system of the state and 90% of the water rights or shares hereby authorized to be sold having been sold to and paid for by the purchaser or owner of land of said system" cannot be interpreted alone and

apart from the other provisions of the contract between the state of Montana and the construction company. See sec. 7543, R. C. M. 1935. Title VII of this same contract between the state of Montana and the construction company has these clarifying statements: "Said party of the second part [construction company] agrees that it will sell or cause to be *sold to the person or persons filing upon any of said Carey Act lands* a water right or share in said irrigation system." (Emphasis supplied.) And further, in the same contract between the same parties, we find this statement: "Such shares or water rights shall be sold to the person or persons filing upon or *purchasing* said Carey Act lands at a price not exceeding Forty Dollars ($40.00) per share." This is the sale referred to; this is the sale contemplated in the contract between the parties; this is the sale necessary to meet the "90%　level;" this can mean nothing else in simple, understandable language than a payment in full in cash and a transfer of the absolute title of the water right or share to the settler upon the lands in the project.

It is true that section 1983, R. C. M. 1935, makes the action for foreclosure of the lien one *in rem* only, since it appears clearly that no deficiency may be docketed against the actual settler. But that *ipso facto* does not make of this foreclosure of a lien or a deed in lieu thereof, a sale of the water right or share. The truth of this is more evident, particularly when considered along with the contracts entered into by the state of Montana acting through its Carey Land Act Board and the construction company. The end result of such foreclosure of a special lien created by Montana statute or the acceptance of deeds in lieu of such foreclosure of such lien clearly does not spell out "sale," but is more in the nature of a forfeiture.

It follows, therefore, under our decision thus far, that this respondent may not consider as a sale the water stock it has so acquired by foreclosure or by deed in lieu of foreclosure, and apply it toward the "90% completion clause" in the contract now existing between the state of Montana and the construction company. This follows logically under the require-

ments of what is a sale as contemplated by the Act and by the contracts entered into by the parties affected thereby.

At this time and stage it is a construction company. As has been stated in Brown v. Portneuf-Marsh Valley Irr. Co., supra, 299 F. 338, 340, a promotion or construction company organized under this Act for the construction of an irrigation project, has for its primary object the making of profits for its organizers and is not entitled to a privileged status in the courts because in a sense it renders a public service. "In a certain sense it renders a public service, and for certain purposes it may be regarded as being, nominally at least, a trustee; but its rights and obligations are defined by contract or by statutory law, and in fact it is neither altruistic in motive nor disinterested in purpose * * * the enterprise is initiated, not by the state, but by the construction company or by the initial promoters whom it succeeds, and it, and not the state land board, makes the proposal which ultimately becomes the substance of the construction contract. The acreage charge for water is so fixed that, if the project turns out approximately as planned, a large profit is realized." It is in the position of being subject to, and bound by, all of the covenants, conditions and strictures of the Federal Carey Land Act and the concurrent Carey Land Act provisions of the state of Montana. We hold that the foreclosing construction company is under a duty statutory and contractual to sell the said Carey Act land and appurtenant water stock to a particular class and that particular class is to consist of actual settlers upon the project. We further conclude that the construction company is bound both contractually and by statute to sell the Carey Act land it had so acquired in parcels which are limited in extent to 160 acres or less to any one person. It therefore follows that the foreclosing corporation is under a duty to sell the Carey Act lands and the appurtenant water stock within a period of time as set out in the contracts between the parties thereto. It follows also that this obligation carries with it the concomitant obligation on the part of the construction company to sell the land and water stock so acquired, at specific prices or

within the range of prices stated in contracts entered into by the parties.

As has been so well stated and argued by plaintiff's counsel, the questions presented in this lawsuit have to do only with Carey Act lands; lands donated or granted to the state of Montana by the Federal Government, patented by the state of Montana to entrymen as actual settlers, and under irrigation works constructed by a construction company, under the provisions of a contract with the state of Montana. Other lands are not in question in this lawsuit.

Further, it must be emphasized that the project *has not been approved* by the state of Montana; nor has the management, control and final ownership of said irrigation works been transferred to the operating company. That the construction company, the plaintiff respondent, is still just that, a construction company of an incomplete Carey Act Project.

We cannot agree with the respondent herein that there is nothing unique in the position or status of a construction company, particularly as contrasted with an individual who has acquired his land and his water stock under this project by purchase through payment of cash in full to the construction company.

Prior to the foreclosure of the special lien or deeds in lieu of foreclosure, surely it is admitted by all that the construction company is a type of trustee, holding the lands and appurtenant water rights with covenants running with the land; that the construction company's special lien was taken subject to those covenants as are the rights of all subsequent encumbrancers and purchasers, and that they are to be considered removed only by payment in full by the settler of the charges against the tract. The case of Valier-Montana Land & Water Co. v. Ries, 109 Mont. 508, 97 Pac. (2d) 584, does not answer the question as to whether or not the construction company may apply the water stock so acquired by it through means of foreclosure or by deeds in lieu of foreclosure toward the 90% completion clause of the contract. This case wherein the construction company is the plain-

tiff, merely holds that the construction company's lien is a prior lien to any interest acquired by subsequent encumbrancers or purchasers. Prior to the time of foreclosure of this special lien, the construction company is not free to hold, transfer and deal with the land and water rights of the project as it sees fit. Before the foreclosure of the special lien, it is admitted by all, the limitations of the project that the land be sold to actual settlers in acreages of not more than 160 acres are effective and controlling on all parties concerned.

But it is then argued with fierce intensity that suddenly under the power of a special lien statute, section 1983, R. C. M. 1935, given to the construction company for the protection of its costs of construction and setting out in particular ways by which that lien may be foreclosed, the construction company becomes a complete stranger to the Valier Project; a stranger to its principles, to its statutory restrictions and to the very contract provisions under which it built the project works. Such argument insists that the construction company may then and does become a land company owning hundreds of acres of land with appurtenant water rights with the privilege, opportunity and right to sell or hold this land and water rights as it so desires, regardless of the statutes and contracts controlling the situation. And further, that all of this may be done and is permissible under the powers of section 1983, R. C. M. 1935, during the time the project is still waiting approval by the state of Montana acting through its Carey Land Act Board. To so hold is to say that the construction company has become a foreigner to this Valier Project situation, a legal situation, which gave birth to the company in the first place.

It is superficial thinking to say that there is in the picture, nevertheless, an operating company to whom the ownership of the system is finally transferred. If such a course, as urged by the respondent construction company, is followed, we are thrown into a legal bramble patch and the actual domination, if not the real ownership of the entire system shifts from the operating company to the construction company. What then of the rights

of the settlers who actually settled upon the lands and have paid in full for their land and water rights under the statutes and contracts provided? What then of the question of enforcement of assessments to be levied by the operating company? These are not legal bogeymen. No legal abracadabra can hide the ultimate disastrous results.

As was said by this court speaking through Mr. Justice Hunt, in State ex rel. Armington v. Wright, 17 Mont. 565, at page 573, 44 Pac. 89, 92: "The very conditions precedent to the right of the state to obtain patents—reclamation, settlement, cultivation—include those which will thereafter divest the state of its title. Under any conditions, the state only holds the legal title for the benefit of *real owners, actual settlers upon the land, irrigating and cultivating the same.* The benefit to the state lies in the advantages of having such actual farmers." (Emphasis supplied.)

The concern of the plaintiff respondent that any other decision than that of the lower court will inject the cloud of uncertainty into Carey Act lands is not well founded. The specter of perpetuality does not exist.

The construction company at this point in the development of the project, says it is now the owner of these lands and water and therefore it has complied with the statutes in such case provided, has met its contract obligation as to the "90% level," and may now sell to anyone in unlimited amounts, or all to one, or retain it as it desires. To sustain such contention would be to completely disregard the intent of the Act, the meaning of the special Montana lien statute, the contractual obligation of the construction company and would be tantamount to a rejection of the principles and purposes of the project. Chief Justice Pemberton, in the early days of this state, speaking in the case of State ex rel. Nolan v. Marshall, 20 Mont. 510, at pages 514 and 515, 52 Pac. 268, 270, carefully sets out the obligations of the state in such cases as this when he states "the general government has by law made to the state conditionally a magnificent donation of lands. It is of the highest importance that the legis-

lature of the state should make provision by law for performing the conditions upon which the right of the people to acquire the land. thus donated depends.'' The construction company may sell to actual settlers in lots of 160 acres or less, secure approval of the project and then transfer the ownership of the system to the operating company. Beyond that point transfers are without the control of the statutes and the contract provisions; beyond that point transfers are free and unrestricted.

We therefore hold:

1. The construction company does acquire title to the land and water appurtenant thereto through and by means of its foreclosure proceedings or by deeds in lieu of foreclosure; but such title is within the framework of the statutes and contracts of the project and still subject to the covenants until sold to settlers.

2. The construction company is obligated to sell the lands and waters appurtenant thereto so acquired by foreclosure or deed in lieu of foreclosure to persons who are within a particular class, to-wit: Actual settlers upon the lands within the project.

3. The construction company is limited in its resale of the lands and waters appurtenant thereto so acquired by it by proceedings in foreclosure or deeds in lieu of foreclosure in parcels of 160 acres or less to any one buyer.

4. The water rights or water stock so acquired by the construction company by means of proceedings of foreclosure or deeds in lieu of foreclosure cannot be construed as a sale under the statutes applicable, nor under the contract provisions pertaining to such sales and therefore may not be counted toward the 90% completion provision found in the contract now existing between the construction company and the state of Montana.

The decree is reversed and the cause remanded with directions to enter judgment in conformity with this opinion.

MR. CHIEF JUSTICE ADAIR and ASSOCIATE JUSTICES FREEBOURN and METCALF, concur.

MR. JUSTICE ANGSTMAN:

I dissent.

I agree with the general statements in the foregoing opinion showing the practical operation of the Carey Land Acts.

Though their operations are somewhat involved the problems before us are comparatively simple. Plaintiff has acquired a large part of the ''water stock'' and lands to which it is appurtenant through foreclosure or through deeds in lieu of foreclosure brought about by the failure of settlers to meet the payments on the water stock.

Is plaintiff still obligated to sell the lands or water stock thus acquired to any particular class of persons and within a definite time and in lots of 160 acres or less to any one person? I think not.

I agree generally with what is said by my associates as to the purposes of the Carey land grant and particularly that the plan was to populate the land with actual settlers. I agree too that this purpose should not be frustrated by any strained construction of the statute.

My position, however, is that the statutes provide the method and means of achieving the desired purposes so far as thought necessary by the legislature and that it is not within our province to rewrite the statutes, however confident we might be that we could improve upon them.

The statutes which we have before us limit applications for the settlement of such lands to 160 acres to any one person. Sec. 81-2115, R. C. M. 1947.

After a purchaser has paid in full for any part of the land the board executes and delivers a deed in the name of the state to the purchaser. Sec. 81-2116, R. C. M. 1947.

The contract treating of the time when patent shall be issued to the settler provides: ''When proof is furnished to said board that the applicant is settled upon the land and has cultivated one-eighth thereof, and complied with the law and regulations, said board will patent said land to said settler.''

The one to whom the deed is issued so far as the statutes are concerned may do with the land thereafter as he pleases. He may sell it to his neighbor who already has his 160 acres. He may do this whether he has completed the installment payments on his water stock or not. He may mortgage it to whomsoever he pleases, subject to the lien hereinafter referred to. Valier-Montana Land & Water Co. v. Ries, 109 Mont. 508, 97 Pac. (2d) 584; R. C. M. 1947, sec. 81-2118.

Had the legislature not intended this to be so, it would have said so. Instead of imposing any restrictions on the right of disposal the legislature expressly provided for a lien, sec. 81-2118, R. C. M. 1947, and in so doing provided that the company "holding or owning said lien may foreclose the same in the same manner as mortgages of real property are foreclosed."

A foreclosure sale passes all the right, title and interest in and to the mortgaged property which the mortgagor possessed at the time the mortgage was executed, Williard v. Campbell, 91 Mont. 493, 11 Pac. (2d) 782, including the right, of course, to sell the property without restriction as to acreage, price or otherwise.

The legislature might have imposed restrictions or limitations upon the rights acquired at such a sale, but it did not. It might have required the deed to contain covenants running with the land, but it did not see fit to do so. Under our statute the only covenants which run with land are those specified in the law, and those incidental thereto. Sec. 58-305, R. C. M. 1947. I find no provision in the law that permits a holding that we have before us by any stretch of the imagination a covenant running with the land. The only covenant contained in the deed which my associates seem to rely on is that, "This conveyance is executed pursuant to authority conferred by the laws of the state of Montana and by the laws of the United States known as the 'Carey Act' approved August 18, 1894, and amendments thereto, relating to the reclamation of arid lands. And it is expressly provided and covenanted that the water right acquired under the provisions of said laws to all of the lands herein conveyed shall attach, and be appurtenant, to said lands, and shall be for-

ever afterward transferable only therewith." I see nothing in that covenant that is capable of being used as a basis for a judicial declaration that it constitutes a covenant running with the land.

To encourage actual settlement of the land by dirt farmers, the legislature specifically provided, sec. 81-2118, R. C. M. 1947, that when the lien holder becomes the purchaser, if the lands and water rights are not redeemed by the original owner within twelve months after the sale, "then at any time within three months thereafter any person desiring to settle and use such lands and water rights may apply to the purchaser at such foreclosure sale to redeem such land and water rights * * *." Why did the legislature limit the right of any intended settler to redeem within fifteen months after the foreclosure sale if the purchaser is obligated to sell to a settler after the fifteen-month period?

There is no restriction placed by statute upon the type of settler who may redeem within the fifteen months. The legislature did not restrict the right of redemption to those only who would not hold more than 160 acres. In fact no restrictions whatever are placed by the statute upon what the purchaser at foreclosure may do with the property. No restrictions were placed upon those who might be purchasers at a foreclosure sale.

It is conceivable that on some foreclosures someone other than the lien holder may become the purchaser. Certainly in such cases the purchaser does not take the land and water rights burdened with any obligations to sell to any particular class or in lots of 160 acres or less. There is nothing in the statutes that suggests a different rule when the lien holder becomes the purchaser. The statutes do not even intimate the existence of any covenants that run with the land and certainly no covenants were contained in the grant of the land and those are the only covenants contemplated by our statutes. Orchard Homes Ditch Co. v. Snavely, 117 Mont. 484, 159 Pac. (2d) 521.

The fact is the legislature contemplated that after foreclosure or deeds in lieu thereof and after the period of redemption has

expired the purchaser at the foreclosure sale stands in the shoes of the original settler for all purposes.

In North Side Canal Company, Ltd., v. Idaho Farms Co., 60 Idaho 748, 96 Pac. (2d) 232, 238, the court had before it this identical question and said: "No * * * restrictions are placed by the statute * * * on what the purchaser at foreclosure [the construction company] may do with the property after he receives the sheriff's deed and the period of redemption has expired * * *."

The court in that case further said: "Appellant takes the position that respondent now owns and holds the land and appurtenant water rights the same as any other purchaser at foreclosure proceedings. Respondent frankly takes the stand that it is in a different position than any other purchaser at such foreclosure proceedings, basing such contention on the claimed continuation of its lien under section 41-1726, I. C. A., until it is paid in *money* in full for the original contract cost of construction and that it owns and holds the land and appurtenant water rights not in complete satisfaction of its contract construction costs but as a kind of trustee merely for resale." (Emphasis supplied.)

The court answered that contention by saying: "The trustee status of the construction company as claimed by respondent (if any) certainly does not exist after foreclosure (or receipt of deed in lieu thereof). * * * The statute does not hint at repeated recapturing and resales or extending the lien beyond foreclosure."

The court in that case further said:

"Respondent further argues it may hold the land and water for resale only and may not sell at any increase over the original price. No such restrictions are placed by the statute, section 41-1735, I. C. A., on what the purchaser at foreclosure may do with the property after he receives the sheriff's deed and the period of redemption has expired, and statutes compelling a construction company to sell its water within any time limit do not apply after purchase at foreclosure or by deed. * * *

"Nothing in the statutes indicates in the slightest that respondent, after its purchase at foreclosure of its lien (or deeds acquired in lieu of foreclosure) retains its lien or occupies any different position than any other purchaser after sheriff's deed has issued."

The same court reaffirmed the holding in the later case of In re Robinson, 61 Idaho 462, 103 Pac. (2d) 693.

To the same effect is North Side Canal Company v. Idaho Farms Co., 9 Cir. 107 F. (2d) 481.

Contention is made that the Idaho case is different from this since the relief asked in that case was different from the relief asked here. That circumstance is of no moment. The fact is that the identical legal question was before the court under statutes practically identical and was squarely passed on. It is idle to suppose that the Idaho court would take any different view of the same questions were they raised in the same manner that they are raised here. Appellate courts are quite resourceful but it is inconceivable that they have sufficient ingenuity to justify contrary statements on the same legal question because of the circumstance that the questions were posed in different ways.

It cannot be contended that either Congress or the state of Montana would be misled in any way were we to sustain the conclusion reached by the trial court and which I think is the correct conclusion under the laws and the contracts before us. When Congress enacted the amendment authorizing the creation of a lien on the lands and water rights it knew what it was doing. It knew that once the doors were open for a lien there existed the possibility that the lands would ultimately fall into the hands of large owners. It fully understood and contemplated these results as is made plain by the summary of discussion in the House of Representatives. in 3 Kinney on Irrigation and Water Rights, 2nd Ed., sec. 1323, p. 2397, where he says: "In the discussion in the House upon the amendment, referred to in our note, it was distinctly pointed out that this amendment, in the form in which it finally passed, would neces-

sarily result in the acquisition by wealthy individuals and corporations of large bodies of land, to the exclusion of the settler. This result was practically conceded by the friends of the measure, but it was also pointed out that in no other manner could the law be made to operate beneficially, and that in any event the desert lands which were then practically worthless would become valuable to the States, even though held by large corporations, and that the States and the citizens would not be damaged by the reclamation of these then worthless lands even if the large corporations and wealthy individuals were given a lien upon them for the money advanced by them for the construction of the works.''

Kinney gives as reference for his statement 28 Cong. Record, pp. 622 et seq. This was evidently a clerical error as the pertinent material is found on pages 6222 et seq.

The other question is, may the acquisition of the water stock through foreclosure or deeds in lieu of foreclosure be construed as a ''sale'' so as to be counted toward the 90% completion provision of the contract between plaintiff and the state of Montana. I would answer in the affirmative as did the trial judge. There had been a sale of the water stock, else the state would not have issued a patent to the land.

My associates say that the transaction here was not a sale within the meaning of section 7581, R. C. M. 1935, now section 74-101, R. C. M. 1947, because the situation is comparable to a contract for sale with title reserved in the seller and rely upon the case of State ex rel. Malin-Yates Co., v. Justice of Peace Court, 52 Mont. 133, 149 Pac. 709. That case had to do with a conditional sale contract of personal property where title was reserved in the seller.

The water rights in question here are by the patents issued to the settlers made appurtenances to the land. That which is appurtenant to land is real property. Sec. 67-207, R. C. M. 1947.

Before foreclosure or deed in lieu thereof the title to the land and water rights was in the settler, for the contract between plaintiff and the settler constituted a purchase and sale of the

water stock, and the agreements constituted mortgages as between the construction company and the settler and this court has so held.

In Valier-Montana Land & Water Co. v. Ries, supra [109 Mont. 508, 97 Pac. (2d) 588], this court said: "It is apparent from the contracts annexed to the amended complaint and mentioned in the findings, that the transactions constituted present purchases and sales of the stock and water rights, that the water right immediately became inseparably appurtenant to the lands mentioned, and that the agreements constituted mortgages as between the parties."

Certainly the conclusion that there was no sale of the water stock finds no basis in fact or law. The water stock was "paid for" within the meaning of the contract by foreclosures or deeds taken in lieu of foreclosure.

In North Side Canal Company v. Idaho Farms Co., supra, the court expressly so held by saying: "Respondent calls attention to the fact that section 41-1726, I. C. A., does not limit the lien to time of foreclosure, but gives one until payment. Payment, however, in case of default is, under sections 41-1728 to 41-1735, I. C. A., inclusive, accomplished completely by foreclosure or deed in lieu thereof." The statutes there considered are practically the same as section 81-2118, R. C. M. 1947.

I think the decree entered by the Hon. C. B. Elwell was right and that it should be affirmed.

Rehearing denied March 29, 1950.

Certiorari in the Supreme Court of the United States denied October 5, 1950.